**STATE of Tennessee, Appellee,**

v.

**Glenn Bernard MANN, Appellant.**

Supreme Court of Tennessee,
at Jackson.

Dec. 8, 1997.

Order Denying Rehearing Feb. 17, 1998.

**504**

William P. Redick, Jr., Whites Creek, Peter D. Heil, Nashville, Charles S. Kelly (Trial Only), Lyman Ingram, Assistant District Public Defender (Trial Only), Dyersburg, for Appellant.

John Knox Walkup, Attorney General and Reporter, Michael E. Moore, Solicitor General, Amy L. Tarkington, Assistant Attorney General, Nashville, C. Phillip Bivens, District Attorney General, for Appellee.

## OPINION

DROWOTA, Justice.

In this capital case, the defendant, Glenn Bernard Mann, was convicted of premeditated first degree murder, aggravated rape and aggravated burglary.[1] In the sentencing hearing, the jury found two aggravating circumstances: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed while the defendant was engaged in committing ... burglary." Tenn.Code Ann. § 39–13–204(i)(5) and (7) (1991). Finding that the two aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both his conviction and sentence, raising nine claims of error, some with numerous subparts. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, pursuant to Tenn.Code Ann. § 39–13–206(a)(1) (1996 Supp.),[2] the case was docketed in this Court.

---

1. Although not raised as an issue in this appeal, the trial judge imposed a twenty-five year sentence on the conviction for aggravated rape and a six year sentence on the conviction for aggravated burglary.

2. "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

The defendant raised numerous issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court, on April 25, 1997, entered an Order setting the cause for oral argument at the June term of Court in Nashville and stating that "[i]n addition to the statutorily mandated issues ... the Court will consider ... [w]hether the District Attorney's offer of a life sentence in exchange for a plea of guilty to capital murder and subsequent seeking of the death penalty upon the defendant's rejection of the offer violates the constitutional rights of the defendant." *See* Tenn. S.Ct. R. 12.[3]

For the reasons explained below, we have determined that the defendant's constitutional rights were not violated by the State's decision to seek the death penalty after the defendant rejected the plea offer. Moreover, the evidence supports the jury's findings as to aggravating and mitigating circumstances, and the sentence of death is not disproportionate or arbitrary. Accordingly, the defendant's conviction for first degree murder and sentence of death by electrocution are affirmed.

### FACTUAL BACKGROUND

The defendant, Glenn Bernard Mann, was convicted by a jury of the premeditated murder of Annie Lou Wilson, a sixty-two-year-old widow who lived alone in her home in Dyer County, Tennessee. The evidence presented at the guilt phase of the trial established that Wilson was last seen alive on Friday night, July 2,1993, by two friends who gave her a ride home from the West Tennessee Opry or "Boogie Barn." According to the proof at trial, Wilson, along with her two friends, regularly attended the Boogie Barn on Friday and Saturday nights. Wilson could not drive and would get a ride to the Boogie Barn with her daughter or her friends and would usually ride home with her friends when the establishment closed at 11:00 p.m.

After dinner on July 2, Wilson's daughter dropped her off at the Boogie Barn. Wilson rode home with her friends, arriving at approximately 11:30 p.m. After making arrangements to pick her up the next evening and waiting until she was safely inside her home, they left. The next day when her friends stopped by at the designated time, Wilson was not waiting for them on the porch, as was her habit, and they were unable to get a response at the front door. Believing that Wilson had decided to ride with her daughter, they continued to their destination, but Wilson never arrived at the Boogie Barn that evening.

Wilson's daughter, Lottie McPherson, also testified that she was unable to contact her mother by telephone on Saturday, July 3, but assumed her mother was out visiting friends. The next day, after attempting several times more to reach her mother by phone, McPherson became concerned and drove to Wilson's home to check on her. When she arrived, McPherson noticed that the mail had not been removed from the mailbox on Saturday. Fearing that her mother was physically ill, McPherson proceeded to the front door with a key ready, but found that the door was not locked. Upon entering the house, McPherson saw her mother's body lying in the floor of the bedroom, on the left side of the bed. McPherson said her mother's skin was cold and there was blood all around her body. After seeing her mother, McPherson went outside and called 911.

Upon arriving at the scene, police found Wilson's partially nude body on the floor to the left of the bed. Wilson was lying on her back, with her left arm over her head. She had been stabbed numerous times and severely beaten. The front of her night gown and panties had been torn. A large amount of blood was on her head and chest. Blood also was on her legs and arms and at various places in the room, including on the carpet and bed. Investigating officers found several items near the body, including a broken ceramic cat, a brassiere, pieces of white underwear, and a box containing Wilson's hearing

---

**3.** Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

aid. From the kitchen floor, officers removed a piece of linoleum which contained a bloody shoe print.

After securing the scene, officers began interviewing neighbors. Tammy Palmer, who lived four houses down from the victim, gave a statement and thereafter testified at trial that, as she was leaving for work on Saturday, July 3, 1993, at approximately 5:00 a.m., she noticed a man walking down the street. He was wearing orange shorts and no shirt and appeared to weigh 180 to 200 pounds and be between 5'10" and 6'0" in height. Palmer said that when she came out of her house, the man stopped for a few seconds and looked up the driveway toward her. Shortly after the murder, police asked Palmer if she could identify the man she had seen from a group of photographs. Palmer selected a person other than the defendant, but told officers she was not sure that the person in the chosen photograph was actually the man she had seen. Palmer informed the officers that she would need to see the man in person to positively identify him. At trial, Palmer identified the defendant as the man she had seen that morning. Palmer had never seen Mann prior to the morning of the murder, and had not seen him since that time until the day of her testimony.

Officers also spoke with the defendant, who lived about six houses down from the victim and was sitting on his porch the morning of the murder. Mann acknowledged that he knew the victim and said that he and his wife were friends of Wilson and previously had eaten dinner at her home. Mann consented to a search of his house and allowed the officers to take a pair of tennis shoes, some shoe strings, red shorts, and a shirt for further testing. A few days later, the officers obtained a search warrant to collect blood and saliva samples from the defendant.

On July 7, 1993, police investigators asked the defendant and several members of his family to accompany them to the police station for questioning. Although no charges had been brought, the defendant was advised of his constitutional rights. During the initial interview, Mann denied any involvement in Wilson's murder. Mann said that Wilson had been generous to him and his family by providing them meals and allowing them to use her phone. He claimed that he had not even been in the neighborhood at the time of her murder. When confronted with inconsistencies in his alibi, however, Mann admitted that he had broken into Wilson's home and killed her. However, this interview was not tape-recorded due to an oversight[4] by the investigating officers. Though he initially refused, after being allowed to speak with his wife, Mann gave another statement which was recorded.

During this interview, Mann said that he awoke on Saturday, July 3, and decided to walk around his neighborhood. He was wearing red shorts, white "K–Swiss" shoes, and no shirt. He remembered seeing a woman standing in her driveway as he walked through the neighborhood. He stopped for a moment, but continued walking and at some point, decided to go to Wilson's home, intending to steal her television and pawn it to get money to pay his rent. He arrived at Wilson's home at approximately 6:00 a.m. After knocking on the front door several times and receiving no answer, Mann shoved the door open with his shoulder and walked toward the television. When Mann saw Wilson coming out of the bedroom, he grabbed a sheet off the couch, threw it over her head so that she could not see him, and ran towards the front door. When Wilson pulled the sheet off her head and called out his name, Mann ran back and pushed Wilson into the bedroom and onto the bed.

The precise order in which events occurred thereafter is not exactly clear, but the evidence established that Wilson, who was hearing impaired, reached for the box containing her hearing aid. Mann knocked it out of her hand. As Wilson continued to call Mann's name, he grabbed a sheet from the bed, covered her face, and held her down by placing his hand around her neck. At some point while she was on the bed, and before she was struck in the head, Mann tore off Wilson's underwear, digitally penetrated her vagina while masturbating, and ejaculated onto her body. Mann grabbed a ceramic cat

4. The "pause" button on the tape recorder was    engaged.

statue and struck the victim twice in the head with it, knocking her to the floor on the left side of the bed. While the victim lay on the floor, Mann ran to the kitchen and obtained a knife. According to Mann, the victim was conscious and calling out his name during this time. Upon returning to the bedroom, Mann stabbed Wilson in the chest several times, because, at first, the knife "wouldn't go in." Finally, he "pulled the knife out, got up and went home." When Mann arrived home, his wife was asleep. He washed his hands with a blue wash cloth and went to bed, but was unable to sleep because he was "hurting." Mann said that he later burned the shorts he was wearing and discarded the knife he had used near a levee.

Mann specifically denied telling anyone, other than the police, about the facts of the murder. Denying that he had intended to kill Wilson, Mann said that he only had intended to steal her television and pawn it for rent money, and that he had specifically chosen her house because he knew she was hearing impaired and thought he could get in and out without being detected. Mann attempted to describe the strange feeling that had come over him before he committed the murder. He denied being under the influence of drugs at the time of the killing and repeatedly told the interrogating officer that he had a problem and needed help. Mann did not testify at trial, but the recorded confession was played for the jury.

Dr. O'Bryan Clay Smith, the Deputy Chief Medical Examiner for West Tennessee, performed the autopsy on Wilson's body. Dr. Smith opined that Wilson had sustained at least fifteen blows to the head by blunt force, resulting in lacerations, bruises and abrasions. Some of the injuries were consistent in pattern with the broken portion of the ceramic cat. Dr. Smith testified that such head injuries can be fatal, but did not cause instantaneous death in this case.

Dr. Smith testified that Wilson also had suffered fourteen superficial stab wounds to the abdomen, and eleven separate stab wounds to the chest area, ranging in depth from just under one inch to over four inches. One of the stab wounds penetrated Wilson's lung and had a portion of her night gown embedded in it. Another wound penetrated the left ventricle of her heart. Dr. Smith determined that either wound would have been fatal, and could have resulted in death in as little as several minutes or as long as an hour following infliction of the wound. The wounds did not, however, result in instantaneous death. Dr. Smith also found injuries to Wilson's neck consistent with manual strangulation, but concluded that these injuries did not result in instantaneous death. The autopsy revealed that Wilson had sustained two fractured ribs as a result of the stab wounds. She suffered a laceration of the vaginal tissue, which, Dr. Smith opined, was caused by an object being forcefully placed in her vagina. The autopsy revealed extensive swelling around Wilson's left wrist and thumb area as well as deep bruising in the left wrist region, which extended into the tendon sheath of the wrist itself. This bruising was caused by considerable blunt force and was consistent with defensive wounds. Dr. Smith concluded that Wilson died from multiple injuries: blunt force to the head, compressive forces applied to the neck, and multiple stab wounds to the chest and abdomen, but he was unable to determine in which order the wounds were inflicted. Based on the pattern of dried blood on Wilson's left arm and right leg, however, Dr. Smith concluded that Wilson was in an upright position for some period of time after the blows to her head were inflicted.

A Tennessee Bureau of Investigation (T.B.I.), forensic specialist in shoe and tire track comparisons and fiber and physical comparisons testified at trial. She had performed a shoe track comparison on the white tennis shoes recovered from Mann's home and the partial foot print on the piece of linoleum recovered from the victim's home and determined that the shoes were consistent in size, shape, and tread design with the print on the linoleum. No definitive match was possible, however, since no individual characteristics, such as cuts, tears, or wear patterns were present on the shoes. In addition, she had compared three knives recovered from Mann's home with the cuts in the victim's nightgown and had concluded that any of the knives could have made the cuts.

Finally, she found no evidence of fiber transfers from another source onto the victim's clothing or bedding.

Also testifying for the State was a T.B.I. serology specialist who said she found human blood on one of the white tennis shoes, but the quantity was insufficient to conduct further testing. No blood was found on the orange shorts recovered from Mann's home. Although human blood was found on the blue wash cloth recovered from Mann's house, the blood was preserved for DNA analysis, so no further testing was performed. On the ceramic cat removed from the scene of the crime blood consistent with that of the victim was found. Finally, semen and spermatozoa were found in combed pubic hair obtained from the victim's body.

Due to problems with the manner in which evidence was collected and stored, the forensic DNA analyst with the T.B.I. testified that she was only able to perform adequate DNA testing on a pair of Mann's socks and a pair of red shorts. Blood was found on these items, but it matched that of Patrick Sweatt, an individual with whom Mann had fought on July 1, 1993, two days before Wilson's murder.

The defendant offered no proof during the guilt phase of the trial. Based upon the proof presented by the State, the jury found Mann guilty of premeditated first degree murder.

At the sentencing phase of the trial, Dr. Smith again testified for the State. He stated that the fifteen blows to Wilson's head would have been severely painful and caused profuse bleeding, but were probably "insufficient to cause unconsciousness." Because the blows were inflicted with moderate to severe force which would have produced a large amount of medium velocity blood spatter, and because the crime scene did not reflect the expected blood spatter, Dr. Smith concluded that the victim's head was probably wrapped in a blanket. Dr. Smith also observed that the manual strangulation, evidenced by the bruises on the victim's neck, would have been painful, causing "extreme distress as [the victim became] hungry for air." Though the stab wounds which penetrated the victim's heart and lung would

have caused pain and bleeding, and interfered with Wilson's ability to breath, Dr. Smith determined that none of the wounds caused instantaneous death. Likewise, although not fatal, the abdominal puncture wounds would have caused moderate pain and minimal bleeding. Dr. Smith opined that all of the wounds were inflicted prior to the victim's death. He said that she could have survived as little as several minutes or as long as an hour after the stab wounds were inflicted. Based on the blood spatters in the bedroom, and the pattern of blood flow on the victim's clothing and body, Dr. Smith opined that some of the wounds were inflicted while Wilson was conscious and in an upright position.

Testifying on behalf of the defendant was Dr. Chris Sperry, the Deputy Chief Medical Examiner for Fulton County, Georgia. Dr. Sperry reviewed the autopsy report and opined, contrary to Dr. Smith, that the initial blow to her head rendered Wilson unconscious. Dr. Sperry based this conclusion on the nature and severity of the head injuries and the lack of defensive wounds to Wilson's hands and arms. If the victim had been unconscious during the attack, Dr. Sperry said, she would not have felt the pain caused by the various wounds. When questioned on cross-examination, however, Dr. Sperry opined that Wilson had suffered "serious physical abuse beyond that necessary to produce death."

Through the testimony of his mother, the jury learned that Mann is the ninth child in a family of ten living children. Mann was placed in special education classes until he dropped out of school in ninth grade. Mann lived with his parents until he married, and according to his mother, Mann was helpful at home. The defendant's mother asked the jury to forgive her son and grant him a second chance. She said that she has given up three children in death and does not want to lose another.

The defendant's father testified that he has served as the pastor of the Original Church of Jesus Christ in Dyersburg for nineteen years. He said that Mann had been brought up in church. He apologized to the victim's

family and asked the jury to spare Mann's life, saying that executing the defendant will not correct the wrong that has been done.

Finally, the defendant's wife of just over one year testified that Mann had been a kind and considerate husband. She made an emotional plea to the jury to spare her husband's life.

Based upon the proof, the jury determined that the State had proven the existence of two aggravating circumstances beyond a reasonable doubt: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed while the defendant was engaged in committing burglary." Tenn.Code Ann. § 39–13–204(i)(5) and (7) (1991). In addition, the jury found that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt and, as a result, sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors assigned by the defendant, we affirm the judgment of the trial court and Court of Criminal Appeals.

### PLEA NEGOTIATIONS

■ Prior to and during the trial of this case, the District Attorney General offered Mann a plea bargain agreement, life imprisonment in exchange for a guilty plea. Mann rejected the offer. The case went to trial with the State seeking the death penalty, and the jury imposed the death penalty. Realizing, through the benefit of hindsight, that the plea offer would have afforded him a more desirable outcome, Mann now urges that his constitutional rights were violated because the State's action in seeking the death penalty after he rejected the plea offer burdened the exercise of his constitutional right to a jury trial. We disagree.

■ A defendant who pleads guilty extends a substantial benefit to the criminal justice system, and in exchange, the State is entitled to extend a less harsh sentence than might otherwise be given. *Brady v. United States,* 397 U.S. 742, 752–53, 90 S.Ct. 1463, 1471–72, 25 L.Ed.2d 747 (1970); *see also Corbitt v. New Jersey,* 439 U.S. 212, 219, 99 S.Ct. 492, 497, 58 L.Ed.2d 466 (1978). Likewise, if a plea offer is rejected, the State may prosecute the defendant to the fullest extent possible and seek whatever punishment is appropriate under the law. *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *see also United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982); *State v. McMurtrey III,* 151 Ariz. 105, 726 P.2d 202, 207 (1986) (citing cases); *State v. Smith,* 280 Mont. 158, 931 P.2d 1272, 1275 (1996); *United States v. Jones,* 973 F.2d 928 (D.C.Cir.1992).

An examination of the relevant authority reveals that the defendant's assertion that the State should be limited in its prosecution to the terms of an offer made during plea negotiations is without merit. In *Hayes,* the defendant was tried on an indictment charging him as an habitual criminal, for which the mandatory punishment was life imprisonment. The prosecutor, during pre-trial negotiations, had been willing to accept a plea of guilty to a lesser charge which carried only a two to ten year sentence range. The prosecutor explicitly advised Hayes that he would return to the grand jury, obtain a new indictment, and proceed on the more serious charge if Hayes did not plead guilty and "save the court the inconvenience and necessity of a trial." *Id.* at 359, 98 S.Ct. at 665. The defendant rejected the offer, chose to go to trial, was convicted, and was sentenced to life imprisonment.

Hayes challenged the conviction and the sentence, contending that his constitutional rights had been violated. The United States Supreme Court rejected the challenge, concluding that the State, through the prosecutor, had not violated the Constitution since it "no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution." *Id.* at 365, 98 S.Ct. at 669. The *Hayes* Court explained its decision as follows:

In our system, so long as the prosecutor has probable cause to believe that the ac-

cused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury generally rests entirely in his discretion. Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation so long as the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. To hold that the prosecutor's desire to induce a guilty plea is an unjustifiable standard, which like race or religion, may play no part in his charging decision, would contradict the very premises that underlie the concept of plea bargaining itself.

*Id.* at 364–65, 98 S.Ct. at 668–69 (internal citations, quotations and footnotes omitted). Even though recognizing that "confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect upon the defendant's assertion of his trial rights," the *Hayes* Court, nevertheless, concluded that "the imposition of these difficult choices [is] an inevitable——and permissible——attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *Id.* at 364, 98 S.Ct. at 668 (internal quotations and citations omitted). The Court accepted as "constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty." *Id.*

The principles announced in *Hayes* were reaffirmed by the Court in *Goodwin.* Concluding that "the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution," the Court refused to accept the defendant's argument that his right to a jury trial had been impermissibly burdened by the State's decision to charge him with a felony offense when he refused to plead guilty to a misdemeanor. *Id.,* 457 U.S. at 382, 102 S.Ct. at 2493. Consequently, the Court held that an initial charging decision is not binding upon the State with respect to the future course of the prosecution. *Id.*

These cases recognize the State's legitimate interest in encouraging the entry of guilty pleas and in facilitating plea bargaining, a process mutually beneficial to both the defendant and the State. *Corbitt,* 439 U.S. at 222, 99 S.Ct. at 499. Since, under this authority, the State is not constitutionally limited or bound by its initial formal charge, the State certainly is not limited or bound, as the defendant argues, by a plea offer which was rejected by the defendant. When a plea is rejected, the State may prosecute a defendant to the fullest extent of the law and seek the most severe punishment available under the law. *Cf. State v. Hines,* 919 S.W.2d 573 (Tenn.1995)(upholding a trial judge's refusal to approve a plea bargain agreement which resulted in the case going to trial in which the defendant was sentenced to death); *Parham v. State,* 885 S.W.2d 375, 381 (Tenn. Crim.App.), *perm. to appeal denied,* (Tenn. 1994)(guilty plea is not involuntary by the fact that the accused is faced with an election between possible death sentence on a plea of not guilty and a lesser sentence upon a guilty plea). To hold, as the defendant urges, that the State can pursue no greater charge or seek no greater punishment than that offered during plea negotiations could effectively abolish the practice of plea bargaining in first degree murder cases. Prosecutors would rarely, if ever, be willing to make an offer of leniency in exchange for a guilty plea. We decline to adopt such a radical and far reaching principle. We agree with the United States Supreme Court that

[w]hatever might be the situation in an ideal world, the fact is that the guilty plea and the concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned. The defendant avoids extended pretrial incarceration and the anxieties and uncertainties of a trial; he gains a speedy disposition of his case, the chance to acknowledge his guilt, and a prompt start in realizing whatever potential there may be for rehabilitation. Judges and prosecutors conserve vital and scarce resources. The public is protected from the risks posed by those charged with criminal offenses who are at large on bail

while awaiting completion of criminal proceedings.

*Blackledge v. Allison,* 431 U.S. 63, 71, 97 S.Ct. 1621, 1627, 52 L.Ed.2d 136 (1977). Plea negotiations often give rise to difficult choices for a defendant. Indeed, "[t]he criminal process ... is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." *Corbitt,* 439 U.S. at 220, n. 8, 99 S.Ct. at 498, n. 8 (internal citations and quotations omitted). In this case, the defendant was faced with the choice of pleading guilty and being sentenced to life imprisonment or exercising his constitutional right to a jury trial, and facing the broad spectrum of possibilities, including, on the one extreme, an acquittal of all charges, and on the other extreme, conviction for first degree murder and imposition of the death penalty. Mann decided to exercise his constitutional right to a jury trial, and he must now accept the consequences of that choice.

Mann's reliance upon *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), is misplaced. Under the federal kidnapping statute at issue in that case, a convicted defendant could be sentenced to death if he had requested a jury trial, but could be sentenced to no more than a life sentence if he had either pleaded guilty or pleaded not guilty and waived the right to a jury trial. Only those who insisted upon a jury trial faced the possibility of a death penalty. The Court declared the statute unconstitutional because it "impose[d] an impermissible burden upon the exercise of a constitutional right." *Id.,* at 572, 88 S.Ct. at 1211. Unlike the statute at issue in *Jackson,* Tennessee law does not reserve the maximum punishment for·murder for those who insist on a jury trial. Indeed, under Tennessee law, the State is free to seek the death penalty following entry of a guilty plea. *See* Tenn.Code Ann. § 39–13–205(a) (1991 Repl.). Accordingly, we conclude that the defendant's assertion that the State violated his constitutional rights by seeking the death penalty after he rejected the plea offer and exercised his right to a jury trial is without merit.

## SUFFICIENCY OF EVIDENCE— AGGRAVATING CIRCUMSTANCES

Pursuant to Tenn.Code Ann. § 39–13–206(c)(1)(B) (1991 Repl.), we have examined the evidence to determine whether it is sufficient to support the aggravating circumstances found by the jury and whether it is sufficient to support the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. We conclude ·that the evidence clearly is sufficient to support these findings.

In accordance with this Court's decision in *State v. Williams,* 690 S.W.2d 517, 529 (Tenn.1985), the trial court correctly instructed the jury as to the definitions of the terms, "heinous," "atrocious," and "cruel." *See also State v. Odom,* 928 S.W.2d 18, 26 (Tenn.1996). Also in accordance with *Williams,* the trial court instructed the jury that "torture" means "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *Id.* The evidence is clearly sufficient to establish both torture and serious physical abuse beyond that necessary to produce death. This sixty-two year old victim was digitally raped and as a result suffered a one inch laceration of the vaginal tissue. She sustained *at least* fifteen blows to the head which were, according to the expert testimony, severely painful. She suffered eleven stab wounds to her chest, ranging in depth from under one inch to over four inches, one penetrating her heart and another her lung. According to the undisputed proof, these wounds would have been painful and interfered with her ability to breath. The victim sustained fourteen additional puncture wounds to her abdomen which would have resulted in pain. She was also manually strangled which, according to the medical testimony, would have caused severe distress as her air supply was terminated. There is no dispute in the proof that the victim was alive when these injuries were inflicted. Although the proof was disputed, the evidence is sufficient to support the con-

clusion that the victim was also conscious during the time many of these wounds were inflicted. In his statement, the defendant said that Wilson called his name over and over, even after he had digitally raped her, struck her in the head with the statue, and was on his way to the kitchen to obtain a knife. Dr. Smith testified that the pattern of blood on the victim's body and the blood spatters in the bedroom indicated that Wilson was in an upright position and conscious for a time during the attack. Finally, Dr. Smith stated that the bruising around Wilson's left wrist was consistent with a defensive wound. Though the defendant offered expert testimony to counter the State's proof relating to consciousness, Dr. Sperry admitted on cross-examination that Wilson had been subjected to serious physical abuse beyond that necessary to produce death. Accordingly, we conclude that the evidence is sufficient to support the jury's finding that this murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. *See State v. Bush*, 942 S.W.2d 489 (Tenn.1997).

■ The evidence is also sufficient to sustain the jury's finding that the murder was committed while the defendant was engaged in committing burglary. The trial judge correctly instructed the jury that "burglary is defined as the unlawful entry into a building or habitation of another without the effective consent of the owner with the intent to commit a felony or theft and the person must have acted intentionally or knowingly." The defendant admitted in his statement that he forced open the door to the victim's home with the intention of stealing her television to pawn for rent money. The proof in this record, therefore, is sufficient to support the jury's finding of this aggravating circumstance.

■ With respect to the jury's finding that the aggravating circumstances outweighed any mitigating circumstances, we have previously held that whether mitigation exists and the weight given aggravating and mitigating circumstances are issues within the province of the jury. *State v. Barber*, 753 S.W.2d 659, 669 (Tenn.1988). In this case, the trial judge specifically instructed the jury to consider the following mitigating circumstances: (1) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; (2) the youth of the defendant at the time of the crime; (3) the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as the result of mental disease or defect which was insufficient to establish a defense to the crime but which substantially affected his judgment; and (4) any other mitigating factor which is raised by the evidence, produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

The proof demonstrates that Mann was twenty-two years old at the time this offense was committed. He claimed that he had no intention of killing the victim when he broke into her home, and did so only when she unexpectedly emerged from the bedroom, and surprised him by calling his name. Based on this portion of the defendant's statement, counsel for the defense argued to the jury that the murder was committed while the defendant was under extreme mental or emotional disturbance. Also in his statement the defendant mentioned that a strange feeling came over him before he committed this crime and Mann told the interrogating officer that he had a problem and needed help for it. Defense counsel, based upon this proof, argued that Mann committed the crime because he has a defective mind and is suffering from a mental disease or defect. Finally, defense counsel asked the jury to consider the testimony of Mann's family—his mother, father, and wife—all of whom asked the jury to spare Mann's life. The trial judge offered to charge the jury on any non-statutory mitigating circumstances submitted by the defense, but no specific instructions were requested. In addition, the trial judge allowed the defense broad leeway to advance mitigating

circumstances to the jury during closing argument. Based upon the proof in this record, we conclude that the evidence is sufficient to support the jury's finding that the aggravating circumstances outweighed any mitigating circumstances.

## COMPARATIVE PROPORTIONALITY REVIEW

The defendant next claims that his sentence is disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The defendant is therefore, asserting that his claim is comparatively disproportionate. In the recent case of *State v. Bland*, 958 S.W.2d 651 (Tenn.1997), we discussed in detail the precedent-seeking analysis this Court has employed over the past eighteen years in determining whether the death sentence imposed in a particular case is *disproportionate* to the sentence imposed in similar cases. In conducting comparative proportionality review, we begin with the presumption that the sentence of death is proportional to the crime of first degree murder. Therefore, as we emphasized in *Bland* the purpose of comparative proportionality review is to "eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty." *Id.*, 958 S.W.2d at 665.

As we had previously explained, and reaffirmed in *Bland*, comparative proportionality review is not a rigid, objective test. *Id.*, 958 S.W.2d at 665 *State v. Cazes*, 875 S.W.2d 253, 270 (Tenn.1994). We do not employ a mathematical formula or scientific grid, nor are we bound to consider only those cases in which exactly the same aggravating circumstances have been found by the jury. *State v. Brimmer*, 876 S.W.2d 75, 84 (Tenn.1994). After identifying a pool of similar cases, we consider a multitude of variables, some of which were listed in *Bland*, in light of the experienced judgment and intuition of the members of this Court. *Bland*, 958 S.W.2d at 668.

Applying that analysis, we conclude that imposition of the death penalty for the senseless, brutal, premeditated killing of this innocent elderly woman is not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Mann's actions showed a total disregard for human life. The victim, a sixty-two year old widow, lived near the defendant and had befriended Mann and his family. As a result of her kindness toward him, the defendant knew that the victim lived alone and was hearing impaired. In fact, he chose to burglarize her home because he had specific knowledge about her vulnerability and about her property. When the victim walked out of her bedroom and surprised Mann in the act of burglarizing her home, he did not hesitate to brutally assault and murder her. He had no provocation, except her recognition of him. The defendant inflicted *at least* forty wounds upon the victim, including fifteen blows to the head, eleven stab wounds to the chest, and fourteen puncture wounds to her abdomen, all of which resulted in pain for the victim. In addition, the defendant digitally raped and manually strangled the victim. Throughout the entire ordeal, according to the defendant's own statement the victim was alive and conscious and calling out her attacker's name. Other proof indicates that the victim was alive and conscious for *at least* some part of the attack. Following the murder, Mann was calm. He went home, washed himself, changed clothes, and went to bed. He calmly spoke to the police the next day. Though the defendant was young at the time of the killing, only twenty-two years old, many others have arrived on death row at an earlier age.[5] Considering the nature of this crime and the character of this defendant, this murder places Mann into the class of defendants for whom the death penalty is an appropriate punishment. Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In *State v. Bush*, 942 S.W.2d 489 (Tenn. 1997), the eighteen-year-old defendant was

---

5. At least 44 of the persons sentenced to death in Tennessee since 1977 were between the ages of 19 and 25 when they committed the murder and at least ten were 18 or 19 when the offense was committed.

sentenced to death for the murder of a helpless seventy-nine year old widow. There, the defendant used the victim's friendship with his grandmother to gain access to her home. Therefore, Bush, like the defendant in this case, was aware that the victim lived alone and was vulnerable. Once inside, Bush, like the defendant in this case, brutally murdered the helpless victim without any provocation by savagely beating her with a stick and by stabbing her forty-three times. He later boasted to acquaintances about practicing karate on the victim. As in this case, the jury found two aggravating circumstances including that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. Tenn.Code Ann. 39–13–204(i)(5) & (i)(6) (1991 Repl).[6] The jury imposed the death penalty even though Bush, unlike the defendant in this case, presented substantial proof in mitigation relating to his youth, troubled childhood, mental disease or defect, and lack of a prior criminal record.

In *State v. Sylvester Smith*, 893 S.W.2d 908 (Tenn.1994), the forty-one-year-old defendant was sentenced to death for the murder of an elderly widow who lived alone in her home in Shelby County. During the course of robbing her home, the defendant beat the victim over her entire body. Her throat had been cut twice. She had been raped, and her body placed in a tub of water one to two inches deep, with a blanket wrapped around her head. The proof showed that Smith carried a weapon with him to commit the crime, a knife he had taken from his sister's home. In mitigation, the defendant introduced proof of his low IQ and attempted to establish that he was mentally retarded. As in this case, Smith sexually assaulted and brutally murdered the elderly female victim in her own home, without any provocation or justification. The jury found three aggravating circumstances, including that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind,[7] Tenn.Code Ann. § 39–2–203(i)(5) (1982).

In *State v. Cazes*, 875 S.W.2d 253 (Tenn. 1994), the twenty-seven-year-old defendant was sentenced to death for the murder of a helpless, elderly woman who lived alone. Cazes worked sporadically as a welder for the victim's step-grandson, and like the defendant in this case, Cazes had been to the home of his victim on prior occasions. Like the defendant in this case, Cazes struck his victim in the head numerous times with a blunt object, most likely a welder's chipping hammer which he had taken with him to the scene of the crime. Her skull was virtually crushed, but the proof showed, as it does in this case, that she was alive and conscious during a portion of the attack. As did the defendant in this case, Cazes sexually assaulted the victim, raping her both anally and vaginally at or near the time of death. Cazes presented a great deal of proof about his troubled childhood, and he presented expert testimony about his impaired mental abilities. The jury found three aggravating circumstances, including that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.[8] Tenn.Code Ann. § 39–2–203(i)(5) (1982).

In *State v. Barber*, 753 S.W.2d 659 (Tenn. 1988), the twenty-nine-year-old defendant

---

**6.** Although the trial judge erroneously charged the jury in the language of the 1989 statute, in *Bush* we held that the error was harmless beyond a reasonable doubt, concluding that the proof established that the murder was heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn.Code Ann. § 39–13–203(i)(5) (1977 & 1982) (Repealed).

**7.** The jury also found two other aggravating circumstances: that the defendant had been previously convicted of violent felony offenses and that the murder was committed while the defendant was engaged in committing a felony. Tenn. Code Ann. § 39–2–203(i)(2) & (7) (1982). Even though it was error under *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992) (Drowota, J. & O'Brien, J., Dissenting) for the jury to consider the felony murder aggravating circumstance since Smith was convicted of first degree felony murder, this Court determined that the error was harmless beyond a reasonable doubt.

**8.** As in *Smith, supra*, the jury also found that the defendant had been previously convicted of violent felony offenses and that the murder was committed while the defendant was engaged in committing a felony. Tenn.Code Ann. § 39–2–203(i)(2) & (7) (1982). As in *Smith*, this Court found that the jury's consideration of the felony

was sentenced to death for the murder of a helpless seventy-five year old woman who lived alone. Barber and his brother decided to rob the victim. Barber's brother knew the victim because he had worked for her on several prior occasions. To gain entry into her home, the defendant broke out the back window with a crescent wrench. When the victim recognized Barber's brother and started toward the phone to call the police, Barber repeatedly hit her on the head with the crescent wrench. She was alive and conscious during the attack as evidenced by the defensive wounds on her arms and hands. As in this case, the defendant was aware, because of the relationship between the victim and his brother, that the victim was in bad health and used a walker. As did Mann in this case, Barber had no hesitation about brutally murdering the victim upon no more provocation than her recognition of one of her assailants. As mitigation, Barber, like Mann, relied upon his youth, and also his capacity for rehabilitation. As in this case, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39–2–203(i)(5) (1982).[9]

In *State v. McNish*, 727 S.W.2d 490 (Tenn. 1987), the twenty-nine-year-old defendant was sentenced to death for the murder of a seventy-year-old widow, who was frail, weighing less than one hundred pounds, but still capable of living alone. McNish, on the other hand, weighed one hundred and sixty-five pounds and held a black belt in karate. Like the defendant in this case, McNish was acquainted with his victim and was aware of her physical limitations. Also like the defendant in this case, McNish struck the victim in the head many times with an object he found in her home, a glass vase. Her skull was fractured in several places, but she was partially conscious when she was found by a neighbor. Therefore, as in this case, she recognized her attacker and suffered pain from the injuries he inflicted. McNish, a heavy user of prescription drugs, apparently was attempting to borrow money from the

victim when the attack began. The jury found one aggravating circumstance, that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn.Code Ann. § 39–2–203(i)(5) (1982).

In *State v. Harbison*, 704 S.W.2d 314 (Tenn.1986), the twenty-seven-year-old defendant was sentenced to death for the murder of a sixty-two year old woman. Harbison, like the defendant in this case, was a casual acquaintance of the victim. As in this case, Harbison was surprised by the victim while he was burglarizing her home. When the victim reached for her purse, Harbison said that he thought she was reaching for a gun and after they began "tusslin," he grabbed a marble vase and hit her in the head with it. The medical testimony showed that the victim was struck at least three times, causing massive skull fractures. The blows were inflicted with such force that the victim's face was literally crushed and disfigured beyond recognition and brain tissue was protruding through the lacerations. As mitigation, the defendant asked the jury to consider that he had no significant prior criminal record, as in this case, and also that death was instantaneous and that he did not bring a weapon to the crime scene. The jury found one aggravating circumstance, that the murder was committed while the defendant was engaged in committing burglary. Tenn.Code Ann. § 39–2–203(i)(7) (1982).

In *State v. Cone*, 665 S.W.2d 87 (Tenn. 1984), the thirty-three-year-old defendant was sentenced to death for the murder of an elderly couple. Hiding and attempting to escape the police after he had burglarized a jewelry store, Cone entered the home of Mr. Todd, ninety-three years of age, and his wife, seventy-nine years of age, by breaking a latch on the rear door. The elderly couple were repeatedly beaten about the head with a blunt instrument, with multiple crushing blows to the head. Based on the defensive wounds which appeared on their arms and hands, the victims, as in this case, were conscious during some part of the attack.

murder aggravating circumstance was harmless error beyond a reasonable doubt.

9. The jury also relied upon the felony-murder aggravating circumstance as a basis for imposition of the death penalty. In *Barber v. State*, 889

S.W.2d 185, 189–90 (Tenn.1994), this Court held the jury's consideration of that aggravating circumstance harmless error beyond a reasonable doubt.

Also like this case, the defendant admitted the killing, but asserted that his mental capacity was impaired by drug use and service in Vietnam. The jury found four aggravating circumstances, including that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn.Code Ann. § 39–2–203(i)(5) (1982).[10]

In *State v. Melson*, 638 S.W.2d 342 (Tenn. 1982), the defendant, a farm foreman, was sentenced to death for murdering the farm owner's wife. A blunt instrument, probably a hammer or crescent wrench, was used to repeatedly beat the victim about the head with such force that pieces of her cranium were embedded into her brain. Trauma to her arms and hands demonstrated that, as in this case, she was conscious and attempting to defend herself during some portion of the ordeal. The only motivation the defendant had for committing the murder was that his victim had discovered him stealing gasoline from the farm supply. Melson had no prior record of significant criminal activity. The jury found two aggravating circumstances including that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn.Code Ann. § 39–2–203(i)(5) (1977).[11]

As we have emphasized again and again, no two cases are identical, but the above cases have many similarities with Mann. In all eight of the cases, the victims were repeatedly beaten about the head with a blunt instrument causing or contributing to their

death. Without any provocation, all eight defendants gained entry into the home of the helpless victims and viciously attacked them. In seven of the eight cases, as in this case, the victims were conscious and experienced the pain and terror of the attacks. In six of the eight cases the defendant, as in this case, knew his victim and was aware of the victim's specific frailties and vulnerabilities. Like this case, there was great disparity of strength between the victims and the defendants. The victims were sexually assaulted in two of the eight cases, as was the victim in this case. In seven of the eight cases, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity. Similarly, in this case, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. In many of the cases, the murder occurred while the defendant was engaged in a robbery or burglary. Like Mann, many of the defendants relied upon their youth and mental disabilities as mitigation of the punishment. After reviewing the cases discussed above and many other cases not herein detailed,[12] we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

### CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39–13–206(c)(1) (1991 Repl.),

---

**10.** The three additional aggravating circumstances found by the jury include: (1) the defendant had previously been convicted of one or more felonies involving the use or threat of violence to the person; (3) the defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during his act of murder; (2) the murders were committed for the purpose of preventing a lawful arrest or prosecution. Tenn.Code Ann. § 39–2–203(i)(2) & (3) & (6) (1977).

**11.** The jury also found that the murder was committed for the purpose of preventing a lawful arrest or prosecution. Tenn.Code Ann. § 39–2–203(i)(6) (1977).

**12.** We also have reviewed other cases in which the defendants received a sentence of life imprisonment. However, there are few life sentence cases which bear similarities to the circum-

stances of this crime and this defendant. The two most similar are easily distinguishable. In *State v. Sepulveda*, No. 03C01–9402–CR–00069, 1997 WL 351107, (Tenn.Crim.App., at Knoxvile, June 26, 1997) (application filed August 25, 1997), the nineteen-year-old defendant burglarized the home of his ninety-five-year-old neighbor looking for money, or for property to sell to buy drugs. During the course of the burglary, he beat the victim with his hands and kicked her in the head. She was alive when found by friends and taken to a hospital and later to a nursing home. She died some weeks later from her injuries. The defendant had a longstanding drug problem, evidenced by an extensive juvenile record for drug offenses. He had only an eighth grade education; his father had died when he was four months old, and his sister had committed suicide at an early age. The jury sentenced the defendant to life imprisonment. Though the killing in that case was reprehensible, the defendant did not utilize a weapon, such as a knife, as

and the principles adopted in prior decisions of this Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39–13–206(c)(1)(A)—(C) (1991 Repl. & 1996 Supp.). We have considered the defendant's assignments of error and determined that none have merit. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge David G. Hayes, and joined in by Judge Jerry L. Smith and Special Judge Lynn W. Brown. Relevant portions of that opinion are published hereafter as an appendix. The defendant's sentence of death by electrocution is affirmed. The sentence shall be carried out as provided by law on the 15th day of April, 1998, unless otherwise ordered by this Court or other proper authorities.

ANDERSON, C.J., and BIRCH and HOLDER, JJ., concur.

REID, J., concurring in the results only.

## APPENDIX

### (Excerpts from the Court of Criminal Appeals' Decision)

IN THE TENNESSEE COURT OF CRIMINAL APPEALS
AT JACKSON
JANUARY SESSION, 1996

State of Tennessee, Appellee,

vs

Glenn Bernard Mann, Appellant.

C.C.A. NO. 02C01–9502–CC–00046

DYER COUNTY

Honorable JOE G. RILEY, Judge

(First Degree Murder)

For the Appellant

William P. Redick, Jr.

Peter D. Heil

Capital Case Resource Center

704 18th Ave. South

Nashville, TN 37203

For the Appellee

Charles W. Burson

Attorney General and Reporter

Amy L. Tarkington

Assistant District Attorney General

Criminal Justice Division

450 James Robertson Pkwy.

Nashville, TN 37243–0493

C. Phillip Bivens

District Attorney General

Dyer County Courthouse

Dyersburg, TN 38024

OPINION FILED: August 16, 1996

### FIRST DEGREE MURDER CONVICTION AND DEATH SENTENCE AFFIRMED

David G. Hayes

Judge

did the defendant in this case, and he had a long history of drug problems. Likewise, in *State v. Whitmore*, No. 03C01–9404–CR–00141, 1997 WL 334904 (Tenn.Crim.App., at Knoxville, June 19, 1997)(application filed August 18, 1997), the eighty-year-old neighbor of the defendant's grandparents was found dead in his home, stabbed thirteen times in the neck and chest. The defendant, and a co-defendant robbed the man to obtain money for drugs. When the victim recognized them, Whitmore's co-defendant killed him with Whitmore's knife. The co-defendant was found to be mentally retarded and not subject to the death penalty. The State sought the death penalty with respect to Whitmore, but the jury returned a sentence of life imprisonment. Unlike the defendant in this case, Whitmore did not actually inflict the fatal wounds.

## 2. ANALYSIS

### A. Sufficiency of the Evidence

The appellant claims that, although the evidence adduced at trial could support a finding of felony murder or second degree murder, the evidence is insufficient to sustain a conviction of premeditated first degree murder. Specifically, the appellant contends that the State did not prove the requisite elements of premeditation and deliberation. He asserts that the appellant's state of mind at the time of the killing precluded premeditation and deliberation. Moreover, the appellant argues that, assuming there was a design to kill, no more than an instant passed between its formulation and its execution. Therefore, the appellant could not have engaged in sufficient deliberation prior to the killing. The State contends that, although the appellant only planned a burglary when he entered Ms. Wilson's house, once inside the house he did indeed carry out a premeditated and deliberate killing.

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982). The defendant must establish that the evidence presented at trial was so deficient that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); Tenn. R.App. P. 13(e).

Moreover, an appellate court may neither reweigh nor reevaluate the evidence when determining its sufficiency. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory." *State v. Williams*, 657 S.W.2d 405, 410 (Tenn.1983), cert. denied, 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *Id.See also State v. Harris*, 839 S.W.2d 54, 75 (Tenn.1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

The State may prove a criminal offense by direct evidence, circumstantial evidence, or a combination of the two. *State v. Tharpe*, 726 S.W.2d 896, 899–900 (Tenn. 1987). *See also State v. Brown*, 836 S.W.2d 530, 541 (Tenn.1992) ("the cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence"). Before a jury may convict a defendant of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971). *See also State v. Gregory*, 862 S.W.2d 574, 577 (Tenn.Crim. App.1993). As in the case of direct evidence, the weight to be given circumstantial evidence and " '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.' " *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958) (citation omitted). In this case, both direct and circumstantial evidence was available for the jury's consideration.[1]

At the time of this offense, the relevant statute defined first degree murder as "[a]n intentional, premeditated and deliberate killing of another." Tenn.Code Ann. § 39–13–

---

1. We address the admissibility of the appellant's statements to the police later in this opinion. *See infra* part 2(D).

202(a)(1) (1991). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn.Code Ann. § 39–11–106(a)(18) (1991). Additionally, premeditation necessitates "a previously formed design or intent to kill," *State v. West*, 844 S.W.2d 144, 147 (Tenn. 1992), and "the exercise of reflection and judgment," Tenn.Code Ann. § 39–13–201(b)(2) (1991). Deliberation requires a "cool purpose" and the absence of "passion or provocation." Tenn.Code Ann. § 39–13–201(b)(1) and Sentencing Commission Comments.[2]

Once a homicide has been proven, it is presumed to be a second degree murder, and the State has the burden of establishing premeditation and deliberation. *Brown*, 836 S.W.2d at 543. Again, although the jury may not engage in speculation, *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1995), the jury may infer premeditation and deliberation from the circumstances surrounding the killing. *Gentry*, 881 S.W.2d at 3; *Taylor v. State*, 506 S.W.2d 175, 178 (Tenn.Crim.App.1973). Our supreme court has delineated several circumstances which may be indicative of premeditation and deliberation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations by the defendant of his intent to kill the victim, and the making of preparations before the killing for the purpose of concealing the crime. *Brown*, 836 S.W.2d at 541–542. This court has also recently noted several factors from which the jury may infer the two elements, including planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. *Bordis*, 905 S.W.2d at

222 (*quoting* 2 W. LaFave and A. Scott, Jr., *Substantive Criminal Law* § 7.7 (1986)).

Initially, the record supports an inference that the appellant killed Ms. Wilson because she was able to identify him. Nevertheless, the appellant suggests that, at the time of the killing, he lacked the mental capacity to either premeditate or deliberate. He contends that "he was suffering from an 'extreme mental or emotional disturbance' ... he was 'substantially impaired' mentally" and, accordingly, could not have killed "upon reflection, 'without passion or provocation,' and otherwise free from the influence of excitement." *Gentry*, 881 S.W.2d at 4. The record contains some evidence, essentially the appellant's own statements to the police, indicating that, at the time of the killing, the appellant was experiencing a "strange feeling" over which he had no control. However, at trial, the appellant introduced no expert testimony in support of his argument.[3] Again, the weight assigned to the evidence is a question for the jury. Therefore, on appeal, this court will not disturb the jury's determination, reflected in its verdict, that the appellant was not experiencing psychological problems sufficient to preclude premeditation and deliberation.

Alternatively, the appellant argues that the formation of the plan to kill and the administration of the fatal blows occurred simultaneously. In support of his argument, the appellant refers to his statement to the police. In his statement, the appellant claimed that he did not intend to kill Ms. Wilson when he entered her house. According to the appellant, when the victim called his name, he instinctively hit her with the ceramic cat. The appellant asserts that, although Dr. Smith testified that the fatal wounds resulted from the subsequent stabbings, Dr. Smith also testified that the initial blows to Ms. Wilson's head were potentially fatal. Again, before a jury may convict a defendant

---

2. With respect to deliberation, we note that, in *State v. Gentry*, 881 S.W.2d 1, 5 (Tenn.Crim.App. 1993), *perm. to appeal denied*, (Tenn.1994), this court stated, "The [mere] presence of agitation or even anger, in our view, does not necessarily mean that the murder could not have occurred with the requisite degree of deliberation."

3. Although the appellant challenges the trial court's denial of expert services, *see infra* part 2(C)(iii), the record reflects that the trial court did grant the appellant access to a psychologist. However, the appellant never introduced the testimony of the psychologist concerning his mental state at the time of the offense.

of premeditated first degree murder, it must find that the defendant consciously engaged in conduct which resulted in the death of the victim, *Bordis*, 905 S.W.2d at 221, and killed "upon reflection, 'without passion or provocation,' and otherwise free from the influence of excitement." *Gentry*, 881 S.W.2d at 4. *See also State v. Brooks*, 880 S.W.2d 390, 392–93 (Tenn.Crim.App.1993), *perm. to appeal denied*, (Tenn.1994) ("the jury must find that the defendant formed the intent to kill prior to the killing, i.e., premeditation, and that the defendant killed with coolness and reflection, i.e., deliberation"). "While it remains true that no specific length of time is required for the formation of a cool, dispassionate intent to kill, *Brown* requires more than a 'split-second' of reflection in order to satisfy the elements of premeditation and deliberation." *West*, 844 S.W.2d at 147.[4]

The record, including the appellant's statement to the police, reveals that the appellant had more than a "split-second" in which to form the requisite elements. Between the time the victim called out the appellant's name and the time the appellant hit the victim with the ceramic cat, the appellant pushed Ms. Wilson from the living room into the adjacent bedroom, pushed her onto the bed, threw a sheet over her head, tore her underwear, and, arguably, raped her.[5] In any event, the record supports the State's position that the stabbings were, in fact, the fatal blows. The appellant did not stab the victim until after he beat her, raped her, and, deciding that an additional tool was needed to accomplish the murder, obtained a knife from the kitchen. The appellant's statement

to the police suggests that, as he retrieved the knife from the kitchen, Ms. Wilson continued to call his name. Accordingly, the jury could very well have concluded that the appellant had ample opportunity to premeditate and deliberate Ms. Wilson's death.

Moreover, the act of obtaining a knife from the kitchen required a certain degree of coolness and reflection. Additionally, the appellant stated to the police that, after killing Ms. Wilson, he went home, cleaned off the blood, and went to bed. "Calmness immediately after a killing may be evidence of a cool, dispassionate, premeditated murder." *West*, 844 S.W.2d at 148 (citing *State v. Browning*, 666 S.W.2d 80, 84 (Tenn.Crim.App.1983), and *Sneed v. State*, 546 S.W.2d 254, 258 (Tenn. Crim.App.1976)).

Accordingly, contrary to the appellant's assertion, the existence of repeated blows to the victim was not the only evidence at trial supporting a finding of premeditation and deliberation. *Brown*, 836 S.W.2d at 542 ("[l]ogically, of course, the fact that repeated blows ... were inflicted on the victim is not sufficient, by itself, to establish first-degree murder").[6] Having reviewed the proof in a light most favorable to the State, we conclude that the evidence is sufficient to support the jury's verdict. This issue, therefore, is without merit.

## B. Instructions on Homicide

The appellant raises the following issues concerning the trial court's instructions on the laws of homicide: the trial court should have instructed the jury on the presumption of second degree murder; the trial court

---

4. In *Brown*, the supreme court suggested abandoning an instruction to the jury that premeditation can be formed in an instant. 836 S.W.2d at 543. The court observed that, because deliberation requires more time, the instruction could confuse a jury. *Id.*

5. It is not altogether clear from the record whether the appellant raped Ms. Wilson before or after the initial blows to the head. The appellant's statement suggests that he raped her before hitting her in the head with the ceramic cat. The appellant engaged in the following exchange with Investigator McDowell:

Mann "You know, oh okay before I hit her in the head with the statue and I took her in the

room and I tore her what's the name off ... Panties...."

McDowell Okay, is that when you had sex with her before you hit her in the head?

Mann Well, I didn't have sex with her ... I put my two middle fingers in her ...

6. The appellant, in fact, argues that the random and haphazard nature of the wounds indicate the absence of premeditation and deliberation. We would note that, although the appellant inflicted various types of wounds, the record reflects that he did so in a systematic manner. The jury could have inferred from the nature of the wounds that the appellant simply wanted to assure Ms. Wilson's death.

erred in giving the jury sequential instructions on first degree murder, second degree murder, and voluntary manslaughter; the trial court failed to define "passion"; and the trial court erroneously defined "intentional." These issues will be addressed in order below.[7]

### I. Presumption of Second Degree Murder

The appellant contends that the trial court should have instructed the jury that the law presumes a homicide to be a second degree murder, and the State must prove the premeditation and deliberation necessary to elevate the crime to first degree murder. *See Brown*, 836 S.W.2d at 543. The State argues that the trial court properly instructed the jury according to the law. *See State v. Haynes*, 720 S.W.2d 76, 85 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1986). Specifically, the State notes, and we agree, that the court correctly instructed the jury on the lesser included offense of second degree murder.[8] Previously, faced with an argument identical to the appellant's, we held that "[w]hen jury instructions given are full, fair, and accurately state the law, there is no requirement that special instructions be given." *State v. Kelley*, 683 S.W.2d 1, 6 (Tenn. Crim.App.), *perm. to appeal denied*, (Tenn. 1984) (*citing State v. Chestnut*, 643 S.W.2d 343, 352 (Tenn.Crim.App.1982)).[9] Accordingly, this issue is without merit.

### ii. Sequential Instructions

The appellant next contends that the trial court erred in giving sequential instructions on first degree murder, second degree murder, and voluntary manslaughter. We disagree. This court has repeatedly upheld "acquittal-first" instructions. *See State v. Raines*, 882 S.W.2d 376, 381–82 (Tenn.Crim. App.), *perm. to appeal denied*, (Tenn.1994); *State v. McPherson*, 882 S.W.2d 365, 375 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1994); *State v. Rutherford*, 876 S.W.2d 118, 119–20 (Tenn.Crim.App.1993), *perm. to appeal denied*, (Tenn.1994); *State v. Beckham*, No. 02C01–9406–CR–00107, 1996 WL 389321 (Tenn.Crim.App., at Jackson, Sept. 27, 1995). Accordingly, this issue is without merit.

### iii. Definition of "Passion"

The appellant also contends that the trial court's instruction on first degree murder was erroneous, because the instruction did not include the definition of "passion." The trial court instructed the jury as follows: "The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." The State asserts that the trial court

---

7. The State argues that these and other issues have been waived. However, in capital cases, because of the qualitative difference between death and other sentences, our supreme court has normally addressed the merits of an issue even if the appellant did not timely object to the error or raise the issue in the motion for new trial. *See State v. Bigbee*, 885 S.W.2d 797, 805 (Tenn.1994); *State v. Duncan*, 698 S.W.2d 63, 67–68 (Tenn.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986); *State v. Strouth*, 620 S.W.2d 467, 471 (Tenn.1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 692 (1982). Accordingly, we consider the merits of the issues raised in the appellant's brief.

8. The appellant contends that, because the trial court's instruction on second degree murder failed to include a definition of "passion," it was erroneous. This issue is addressed *infra* part 2(B)(iii).

9. The defendant has a constitutional right to a correct and complete charge of the law. *State v. Teel*, 793 S.W.2d 236, 249 (Tenn.), cert. denied. 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990); *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn.Crim.App.1995). However, this court need only invalidate the jury charge "if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." *Forbes*, 918 S.W.2d at 447 (citing *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn.Crim.App. 1994)). This court has observed that the instruction, that a homicide is presumed to be second degree murder, is designed to inform the jury that the State has the burden of proving each and every element of the offense of first degree murder. *State v. Montague*, No. 03C01–9306–CR–00192 (Tenn.Crim.App. at Knoxville, November 21, 1994), *perm. to appeal denied*, (Tenn. 1995). We conclude that the jury instructions in this case served that purpose.

employed the ordinary usage of the word "passion," and, accordingly, further instruction was unnecessary.

The appellant does not offer any authority which requires the trial court to define "passion." Moreover, although Tennessee courts have defined the term, *see. e.g., State v. Bullington*, 532 S.W.2d 556, 560 (Tenn.1976), we have been unable to find any case which requires a court to provide that definition. We conclude that the word "passion" is "in common use and can be understood by people of ordinary intelligence." *Raines*, 882 S.W.2d at 383. In the absence of anything in the charge to obscure the meaning of such terms, it is not necessary for the court to define or explain them. *Id.See also State v. Braden*, 867 S.W.2d 750, 761 (Tenn.Crim. App.), *perm. to appeal denied*, (Tenn.1993). This issue is without merit.

### iv. Definition of "intentional"

Finally, the appellant argues that the trial court's instruction defining "intentional" created the possibility of a non-unanimous jury verdict. The trial court, in defining "intentional," quoted verbatim Tenn.Code Ann. § 39–11–106(a)(18). In essence, the trial judge instructed the jury that a person acts "intentionally" when that person acts with a conscious objective either (1) to cause a particular result or (2) to engage in particular conduct. *See also* T.P.I.Crim. No. 2.08. The appellant claims that the trial court's disjunctive instruction permitted the jury, in convicting the appellant of premeditated first degree murder, to choose either general in-

tent or specific intent. Therefore, according to the appellant, it is impossible to determine whether the jury unanimously found that the appellant intended to cause the result, i.e., specific intent, rather than simply engage in the conduct, i.e., general intent.[10]

As the appellant correctly observes in his brief, the legislature has abandoned the "confusing distinction between general and specific intent." Sentencing Commission Comments, Tenn.Code Ann. § 39–11–301 (1991). This court is unconvinced that Tenn.Code Ann. § 39–11–106(a)(18), in defining "intentional," perpetuates this distinction. Rather, because "intentional" offenses include both offenses which only require particular conduct, e.g., rape and burglary, and offenses which also require a particular result, e.g., homicide, the definition of "intentional" must encompass both factual circumstances. Indeed, in the instant case, the appellant was charged with aggravated rape and aggravated burglary in addition to first degree murder.

We acknowledge that "[s]imply reading a statute to the jury, when the statute is ambiguous and open to more than one interpretation, does not satisfy 'the demands of justice' or the accused's constitutional right of trial by jury." *Raines*, 882 S.W.2d at 382. However, in this case, the trial court's instructions concerning premeditated first degree murder clarified any ambiguity inherent in Tenn.Code Ann. § 39–11–106(a)(18). The trial court gave the jury the following instruction:

> For you to find the defendant guilty of [premeditated first degree murder], the

---

**10.** The appellant cites *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn.1993), and *State v. Brown*, 823 S.W.2d 576, 583 (Tenn.Crim.App. 1991), for the general proposition that, in cases involving a potential for a "patchwork verdict" based on different offenses in evidence, the trial court must augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a. particular set of facts. *See also Forbes*, 918 S.W.2d at 446 ("[w]here there is technically one offense, but evidence of multiple acts which would constitute the offense, a defendant is still entitled to the protection of unanimity"). *See Schad v. Arizona*, 501 U.S. 624, 632–633, 111 S.Ct. 2491, 2497–2498, 115 L.Ed.2d 555 (1991)(a plurality of the Supreme Court observed that there is no general

requirement under the federal constitution that a jury reach agreement on preliminary factual issues which underlie a verdict, either with respect to actus reus or mens rea, unless the "differences between means [of committing a crime] become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses"); *United States v. Sanderson*, 966 F.2d 184, 187–188 (6th Cir.1992). However, we do not agree with the appellant that the relevant statutes and jury instructions in this case provided alternative mental states from which members of the jury could choose in finding the appellant guilty of premeditated first degree murder.

State must have proven to you, the jury, beyond a reasonable doubt the existence of the following essential elements .... that the killing was premeditated. ... *Premeditation means that the intent to kill must have been formed prior to the act itself.*

(Emphasis added). As the instruction states, in order to convict the appellant of premeditated first degree murder, the jury was required to find not only that he intended to engage in the act, i.e., the assault, but also that he intended to cause the result, i.e., Ms. Wilson's death. The trial court correctly instructed the jury according to the laws of this state. This issue is without merit.

## C. Trial Counsel's Compensation, Services, and Time to Prepare for Trial

In his next issue, the appellant contends that his trial counsel was not given the compensation, time, or services necessary to provide an adequate defense pursuant to the United States and Tennessee constitutions. Specifically, the appellant claims that the trial court erroneously denied motions for continuances, denied motions for compensation, denied motions for appointment of co-counsel, and denied motions for the provision of expert services. The State contends that the trial court acted properly and within the confines of the law.

A brief summary of the pre-trial proceedings is helpful in reviewing this issue. The indictment was returned against the appellant on August 9, 1993. The appellant retained counsel, and his retained counsel appeared before the court for the arraignment of the appellant on August 24, 1993. Although originally scheduled for November 30, 1993, the trial was continued until February 1, 1994.

On January 27, 1994, the court again continued the trial until May 3, 1994. On that

same day, the court granted the appellant's motion for a declaration of indigency, but denied counsel's motion for compensation. The court stated that it was under a duty to appoint the public defender before appointing or compensating private counsel.[11] However, there was neither a motion for the appointment of the public defender nor a motion for withdrawal of private counsel before the court at that time. The public defender was not appointed until April 8, 1994.

During an ex parte hearing on January 27, 1994, the court denied the appellant's motion for a jury statistician and a mitigation specialist. The court held that the Constitution does not require the appointment of either expert, and the court noted that the investigator already appointed could perform the same kind of work as a mitigation specialist. On January 28, 1994, the court authorized $3,000 for the investigative services of Terry W. Sweat and Gail Hedrick, and $3,000 for the psychological services of Dr. Gillian Blair.[12] On the same day, the court denied a request for a neuropharmacologist, a statistician, and a forensic expert, because the appellant failed to indicate who would be performing these services and how much compensation would be required. On April 8, 1994, the court authorized an additional $1,500 for the investigative services of Terry W. Sweat. On May 27, 1994, the court granted the appellant's motion for $3,000 for the services of Dr. Chris Sperry, an expert pathologist.

On May 3, 1994, the trial court continued the trial until May 31, 1994. The court, however, denied motions for further continuances on May 13, May 18, and May 31, 1994. The trial court also denied the appellant's motion for a continuance following the State's presentation of proof at the sentencing phase of the trial.

---

11. Defense counsel also submitted a motion for the appointment of co-counsel. Apparently Mr. Strawn, a law partner of lead counsel Mr. Kelly, had been assisting in the representation and requested appointment. However, because the judge believed he was obligated to appoint the public defender, he did not appoint Mr. Strawn as co-counsel. Mr. Strawn had, in fact, previously filed a notice of appearance. On March 1, 1994, the court allowed Mr. Strawn to withdraw his notice of appearance.

12. An earlier motion for support services was denied on December 15, 1993, because the appellant had not yet been declared indigent.

## I. Time to Prepare

The appellant claims that his counsel was not afforded adequate time to prepare for trial. Primarily, he contends that co-counsel (i.e. the public defender) was not appointed until less than two months prior to trial, that lead counsel and co-counsel were unable to sufficiently discuss the case, that lead counsel planned a vacation the week before the trial, and that counsel did not have time to prepare for the sentencing phase of the trial.

The granting or denial of a continuance is a matter left to the sole discretion of the trial court. *State v. Morgan*, 825 S.W.2d 113, 117 (Tenn.Crim.App.1991), *perm. to appeal denied*, (Tenn.1992). An appellate court may reverse a conviction only if the denial of the continuance was an abuse of discretion, and a different result might reasonably have been reached had the continuance been granted. *State v. Dykes*, 803 S.W.2d 250, 257 (Tenn. Crim.App.), *perm. to appeal denied*, (Tenn. 1990). We can find nothing in the record which suggests that the trial court abused its discretion, thereby prejudicing the appellant. Although the court denied three motions by defense counsel for continuances just prior to trial, he had earlier granted several such motions. As already noted, although the trial was originally scheduled for November 30, 1993, it began on May 31, 1994. In other words, the trial court postponed the trial date by approximately six months.

With respect to the appellant's argument that co-counsel did not have adequate time to prepare for trial, we note that lead counsel had been representing the appellant since August, 1993. Thus, by the time co-counsel was appointed, lead counsel had invested well over seven months in the case. This scenario is quite similar to the one presented in *State v. Dillingham*, 03C01–9110–CR–319, 1993 WL 22155 (Tenn.Crim.App. at Knoxville), *perm. to appeal denied*, (Tenn.1993). In *Dillingham*, the public defender was only afforded one month to prepare for a case with which a previous attorney had been involved. · *Id.* Finding no abuse of discretion, this court declined to interfere with the trial court's denial of the motion for continuance, because the public defender had the benefit of prior counsel's preparations and efforts. *Id.* Co-counsel in the instant case was appointed in early April, 1994, somewhat less than two months before trial.[13] Although a capital case will clearly require more preparation by defense counsel than a non-capital case, we conclude that co-counsel was afforded adequate time to familiarize himself with the facts and assist in the appellant's defense.

The appellant also argues that lead counsel and co-counsel did not have sufficient opportunities to meet and discuss the case. On this same note, the appellant argues that lead counsel's pre-planned vacation interfered with counsel's trial preparations. The trial court is not responsible for counsel's time management. Furthermore, there is no evidence in the record indicating that just under two months was not adequate time for the attorneys to meet and prepare for trial.

As counsel acknowledged during pre-trial hearings, the more important aspect of this particular trial was the sentencing phase. The appellant argues that he was not appointed expert services in time to adequately prepare a mitigation case. However, the record reflects that the court authorized investigative services on January 28, 1994, and, again, on April 8, 1994.[14] Moreover, although the trial court did not authorize funding for a pathologist until a little over a week before trial, time limitations apparently did not impede that expert's testimony in any way. This witness was able to testify that, in his opinion, the initial blows to the victim's head probably rendered her unconscious. We conclude that the trial court did not abuse his discretion nor was the appellant

13. When the public defender was appointed on April 8, 1994, the trial was tentatively set for May 3, 1994. However, on May 3, 1994, the court continued the trial until May 31, 1994.

14. The investigator used by defense counsel was associated with lead counsel's firm. Thus, the investigator was arguably available to lead counsel when counsel made his initial appearance in this case in August, 1993. As mentioned earlier, the record does reveal that the trial court denied counsel's request for investigative services in December, 1993, before the appellant was declared indigent.

prejudiced by the denial of additional continuances. This issue is without merit.

### ii. Compensation

The appellant next contends that the trial court denied him the right to counsel by denying lead counsel's motion for compensation. In support of his argument, the appellant cites numerous provisions of the American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Model Rules of Professional Conduct,* and *Standards for Criminal Justice.* However, the appropriate authority on this issue can be found in provisions of the Tennessee Code, Rules of the Tennessee Supreme Court, and Tennessee Rules of Criminal Procedure.

As the appellant correctly notes, Tenn. R.Crim. P. 44(a) provides that every indigent defendant shall be entitled to the appointment of counsel. However, Rule 44(b) further provides that the "procedures for implementing the assignment of counsel shall be those provided by law." Tenn.Code Ann. § 40–14–202(a) (1994 Supp.), in pertinent part, requires:

> in all felony cases, if the accused be not represented by counsel, and the court determines ... that the accused is an indigent person who has not competently waived the accused's right to counsel, the court shall appoint to represent the accused either *the public defender,* if there is one for the county, or, *in the absence of a public defender,* a competent attorney licensed in this state.

(Emphasis added). Sup.Ct. Rule 13 further mandates that the appellant "shall not have the right to select the appointed counsel from the Public Defender Service, from the panel of attorneys, or otherwise." Rule 13 continues: "In a capital case two attorneys may be appointed for one defendant and each is eligible for compensation."

Before the appellant was declared indigent, counsel filed a motion for compensation, because, according to counsel, the funds initially paid by the appellant were depleted. As mentioned earlier, once the appellant was declared indigent, the court stated that it had a statutory obligation to appoint the public defender before appointing private counsel. Consequently, the court denied the appellant's motion for compensation. The court further stated that it would appoint the public defender if there was such a motion before the court. However, defense counsel filed neither a motion for the appointment of counsel nor a motion to withdraw.[15] Only several months later did defense counsel request the appointment of co-counsel.[16] The court then appointed the public defender to assist in the case. Again, lead counsel did not file a motion to withdraw. We conclude that his actions reflected his intent to continue representation of the appellant regardless of compensation.[17] Accordingly, the trial court did not err in refusing to appoint or compensate lead counsel.

The appellant also infers that the trial court's denial of compensation resulted in ineffective assistance of counsel at the sentencing phase of the trial. However, the appellant fails to explain how lead counsel's performance was deficient or how the appellant was prejudiced by the purported deficient performance. *See Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2054, 80 L.Ed.2d 674 (1984). Moreover, after

---

**15.** At no time during his representation of the appellant did lead counsel, Mr. Kelly, enter a motion to withdraw due to lack of compensation. Mr. Kelly did, however, enter a motion to withdraw due to ethical considerations. The trial court determined that this motion was without merit.

**16.** Mr. Strawn, law partner with lead counsel Mr. Kelly, filed a notice of appearance in this case which the trial court allowed. Mr. Strawn also attempted to receive compensation for his representation. Because, however, the court would not appoint private counsel before ap-

pointing the public defender, on March 1, 1994, Mr. Strawn sought and was granted permission to withdraw his notice of appearance.

**17.** There was some question in the trial court concerning ABA guidelines governing the trial qualifications of lead counsel and co-counsel in a capital case. Under the guidelines, lead counsel in a capital case should have some prior experience with capital cases. Mr. Kelly possessed such prior experience. Because he did not move to withdraw, the court satisfied the ABA guidelines.

a review of the record, we cannot conclude that counsel's performance was below the range of competence demanded of attorney's in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975). Accordingly, this issue is without merit.

### iii. Services

At various times before trial, the appellant requested investigative services, a psychologist, a mitigation specialist, a jury selection statistician, a neuropharmacologist, a forensic expert, and a pathologist. The court granted the funding for the investigator, the psychologist, and the pathologist, but denied the request for the neuropharmacologist, forensic expert, mitigation specialist, and jury selection statistician. The appellant claims that the court's denial of the above services violated his right to an adequate defense. *See generally State v. Elliott*, 524 S.W.2d 473 (Tenn.1975).

Tenn.Code Ann. § 40–14–207(b) (1990) provides, in pertinent part:

In capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, such court in an ex parte hearing may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

Sup.Ct. Rule 13, § 2(B)(10) further provides:

The defense counsel must seek prior approval for such services by submitting a written motion to the Court setting forth: (a) the name of the proposed expert or service; (b) how, when and where the examination is to be conducted or the services are to be performed; (c) the cost of the evaluation and the report thereof; and (d) the cost of any other necessary services, such as court appearances.

As the statute notes, the decision of whether to authorize the investigative or expert services lies within the discretion of the trial court. *See also Cazes*, 875 S.W.2d at 261. Further, Rule 13 and relevant case law maintain that the right to these services exists only upon a showing of a particularized need. *See State v. Shepherd*, 902 S.W.2d 895, 904 (Tenn.1995); *State v. Evans*, 838 S.W.2d 185, 192 (Tenn.1992), *cert. denied*, 510 U.S. 1064, 114 S.Ct. 740, 126 L.Ed.2d 702 (1994); *State v. Black*, 815 S.W.2d 166, 180 (Tenn.1991). "The defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that his defense cannot be fully developed without such professional assistance." *Evans*, 838 S.W.2d at 192; *see also Shepherd*, 902 S.W.2d at 904.

Again, upon finding the appellant indigent, the court properly granted the appellant investigative and expert psychological services.[18] The court also granted the appellant's request for a pathologist. Nevertheless, the appellant claims that the court denied him an adequate defense by granting this latter request only a few days before trial. As discussed earlier, the pathologist was only needed to rebut the State's evidence that the initial blows to the head did not render the victim unconscious. Because the appellant's expert provided the testimony the appellant sought, we conclude that the trial court's actions were not erroneous.

In denying the motion for the services of a neuropharmacologist, statistician, and forensic expert, the judge stated that the appellant had failed to comply with the requirements of Rule 13. After reviewing the record, we agree. Accordingly, we conclude that the trial court also acted properly in this respect.

Moreover, the trial court appropriately denied the appellant's request for a jury selection expert. The Supreme Court, in *Black*, 815 S.W.2d at 179–80, held that the trial court may deny a defendant the assistance of a jury expert when the defendant has failed to demonstrate a particularized need. Defense counsel explained that the jury expert was needed "to help counsel determine whether or not these are the jury people that

---

**18.** Although the court authorized funding for the psychological services of Dr. Gillian Blair, the appellant never introduced her as a witness.

we need not to execute him." This statement does not describe a particularized need.

Finally, the trial court denied the appellant the assistance of a mitigation specialist. Defense counsel asserted that the expert was necessary to "gather all information from [the appellant's] background to attempt to put on mitigation at the sentencing hearing of the case." However, we agree with the trial court that the investigator previously authorized by the court was more than capable of performing this type of work.

Having reviewed the appellant's claims that his trial counsel was not given the compensation, time, or services necessary to provide an adequate defense, we find this issue to be without merit.

## D. The Appellant's Statements

The appellant contends that his statements to the police were taken in violation of his constitutional rights. He claims that he was subjected to custodial interrogation before being advised of his rights, that he was never informed of his rights, and that he never waived any of his rights.

The trial court denied a pre-trial motion to suppress the appellant's statements to the police. The court ruled that the statements were voluntarily given in accordance with the appellant's constitutional rights. Testimony at the suppression hearing revealed that on July 7, 1993, at approximately 2:00 p.m., the appellant and his wife were asked to accompany Investigators Stan Cavness and Jim Porter to the Dyersburg Police Department for questioning. The officers told the appellant and his wife that they were not under arrest. Nevertheless, Porter informed them of their *Miranda* rights. Other members of the appellant's family were also asked at that time to go to the station and talk with the officers.

From 2:00 p.m. until approximately 4:00 p.m., the officers talked with the appellant's family members in order to establish the appellant's whereabouts at the time of the murder. At some point, Ms. Boxley, the appellant's mother-in-law, stated that she did not want to talk to the police and was allowed to leave. The appellant was placed in a conference room. However, the conference room was never locked, and the trial court found that the appellant's freedom of activity was not restricted. Subsequently, the appellant was escorted to an interrogation room where the appellant gave several statements to the police.

Shortly after 4:00 p.m., Investigator Cavness obtained the "alibi statement" from the appellant. Cavness then conferred with the other officers concerning the statements of the family members. They noticed inconsistencies between the appellant's statement and those of his family members. At about 6:00 p.m., Investigators Cavness and McDowell interviewed the appellant for an hour. Cavness had a tape recorder in his pocket, which, contrary to his assumption, did not record the conversation. The officers testified that they again informed the appellant of his rights. During this unrecorded conversation, the officers pointed out "holes" in the appellant's alibi. The appellant eventually confessed to the murder.

The officers advised the appellant that he was under arrest and transferred him to the holding cell. The officers then discovered that the tape recorder had not recorded the appellant's confession. Accordingly, the officers asked the appellant if he would give another statement. The appellant stated that he wanted to see his wife first.. The officers complied, and the appellant's wife was brought to the station.

At about 9:00 p.m., after the appellant had seen his wife, McDowell obtained a recorded statement from the appellant. The officer again advised the appellant of his rights, and the appellant again confessed to committing the crime. The appellant never asked for an attorney. Sometime during that afternoon, the officers gave the appellant a soft drink.

The appellant testified during the suppression hearing. He stated that he was placed in feet shackles during the unrecorded conversation. Additionally, the appellant stated that McDowell was yelling at him, calling him derogatory names, and "got to grabbing on [him], poking on [him]." He stated that McDowell threatened to kill him. According to the appellant, McDowell also promised

that the appellant would receive psychological treatment and would ultimately be placed in a hospital rather than in prison. As mentioned earlier, Officers Jeff Holt and Jim Porter testified that they sat outside the interrogation room during both the unrecorded and recorded conversations and did not hear any threats or use of force. Moreover, during a later pre-trial hearing, appellant's counsel stated that the appellant had indicated to him that he had lied concerning the officers' use of threats, force, or promises to obtain his statement.

The court found that at no point in time were threats, force, or promises used by the police to obtain the appellant's statements. Although the officers indicated to the appellant that they would inform the court about the appellant's psychological problems, they did not guarantee treatment. Additionally, the court found that the appellant was adequately advised of his rights. The appellant was first advised of his rights when the officers asked the appellant and his wife to accompany them to the station. It is unclear whether the appellant was advised of his rights immediately prior to the "alibi statement." Nevertheless, the court found that the conversation did not amount to a custodial interrogation. Finally, the court found that *Miranda* warnings were given to the appellant prior to the unrecorded and recorded statements. Indeed, in the recorded statement, the appellant acknowledged that he had been informed of his rights several times before.

It is the duty of the trial court to determine the voluntariness and the admissibility of the appellant's statement. *State v. Pursley,* 550 S.W.2d 949, 950 (Tenn.1977). Moreover, the trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the appellant can show that the evidence preponderates against the trial court's ruling. *State v. O'Guinn,* 709 S.W.2d 561, 566 (Tenn.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986). *See also State v. Stephenson,* 878 S.W.2d 530, 544 (Tenn.1994).

## I.  Custodial interrogation

The appellant claims that he was in custody during the first, "alibi statement." According to the appellant, because there is no clear evidence that he was advised of his rights immediately prior to this statement, this statement should have been suppressed. The appellant further argues that the subsequent statements were tainted by this first involuntary statement and should have been suppressed. *See State v. Smith,* 834 S.W.2d 915, 918 (Tenn.1992).

In *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), the United States Supreme Court ruled that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires police officers, before initiating questioning, to advise the putative defendant of his right to remain silent and his right to counsel. If these warnings are not given, statements elicited from the individual may not be admitted for certain purposes in a criminal trial. *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994). However, an officer's obligation to administer *Miranda* warnings only attaches " 'where there has been such a restriction on a person's freedom as to render him "in custody." ' " *Id.* (citing *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). In *Miranda,* the Court explained that a "custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612.

Thus, when determining whether or not there was custodial interrogation, the initial inquiry is whether the suspect was "in custody." The trial court will be given a wide latitude of discretion in its decision, and that decision will not be overturned by this Court unless it appears there has been an abuse of the trial court's discretion and a violation of the appellant's rights. *See State v. Smith,* 868 S.W.2d 561, 570 (Tenn.1993), *cert. denied,* 513 U.S. 960, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994); *State v. Nakdimen,* 735 S.W.2d 799, 802 (Tenn.Crim.App.1987).

We conclude that the trial court did not abuse its discretion in determining that the appellant was not in custody during the initial "alibi statement." "she initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury.*[19] Specifically, the inquiry is "how a reasonable person in the suspect's position would have understood his position," i.e., would he have felt that he was not free to leave and, thus, in custody. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). *See also Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *State v. Mosier,* 888 S.W.2d 781, 784 (Tenn.Crim.App.1994); *State v. Furlough,* 797 S.W.2d 631, 639 (Tenn.Crim.App.1990).

Again, the appellant and his wife were asked to come to the station and were told that they were not under arrest.[20] Although the appellant was placed in a conference room for nearly two hours while the officers interviewed his relatives, he was neither locked in the room nor told that he could not leave. Moreover, the record indicates that, during those two hours, the appellant was not entirely isolated. His wife was in the conference room for a portion of the two hours. The officers periodically checked on the appellant and even offered him a soft drink. The appellant never asked if he could leave, and the officers never told him that he could not. The record further reflects that Ms. Boxley, the appellant's mother-in-law, decided she did not want to talk to the police, and the officers allowed her to go. Accordingly, the circumstances do not demonstrate that a reasonable person would have believed he or she was not free to leave.

The appellant also contends that the two subsequent statements, the unrecorded statement taken around 6:00 p.m. and the recorded statement taken around 9:00 p.m., were tainted by the involuntary "alibi statement." Since we have concluded that the "alibi statement" did not stem from custodial interrogation, this contention is without merit.

### ii. Waiver

Alternatively, the appellant argues that the State has failed to demonstrate by a preponderance of the evidence that the appellant waived his rights. He contends that the officers never obtained a written waiver of rights from him and claims that the oral testimony of the officers is insufficient to support the court's finding that the statements were given voluntarily.

Although the right to counsel and the right against self-incrimination are constitutional rights, they may be waived, provided the waiver is made "voluntarily, knowingly, and intelligently." *State v. Middlebrooks,* 840 S.W.2d 317, 326 (Tenn.1992), *cert. dismissed,* 510 U.S. 124, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993)(citing *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612). "A waiver is valid if the suspect is aware of the nature of the right being abandoned and the consequences of the decision to abandon the right." *Stephenson,* 878 S.W.2d at 547. The totality of the circumstances must be examined to determine whether the choice was uncoerced and whether the person understood the consequences of his decision. *Id.* at 545.

McDowell, Cavness, Porter, and Holt testified at the suppression hearing that the ap-

19. The officers uncommunicated belief that the person being questioned is a prime suspect has no bearing on the custodial interrogation determination. *Id.* 511 U.S. at 322–326, 114 S.Ct. at 1529–1530. In *Beckwith v. United States,* 425 U.S. 341, 346, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976), the United States Supreme Court expressly rejected the contention that the "in custody" requirement which triggers *Miranda* warnings was satisfied merely because the police interviewed a suspect who was the "focus" of a criminal investigation. The Court held: "It was the compulsive aspect of custodial interrogation and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose *Miranda* requirements with regard to custodial questioning." *Id.* Nor are warnings required simply because the questioning takes place at the station house. *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714.

20. As mentioned earlier, Investigator Cavness testified that the appellant and his wife were nonetheless advised of their rights.

pellant was advised of his rights before the unrecorded statement and before the recorded statement. Although the police failed to obtain a written waiver, the law does not require a written waiver. In support of his argument, the appellant refers to his young age (22), lack of a high school education, race (African–American), and psychological condition. However, the appellant was not a stranger to the criminal justice system. He had been questioned by the police in the past and had been incarcerated pursuant to a previous conviction. With respect to the appellant's psychological condition, there is no evidence in the record, apart from the appellant's own statements, that the appellant was in fact suffering psychological difficulties. The court granted the appellant psychological services, yet the record contains no reports, statements, or findings from the appointed psychologist.

The transcript of the recorded statement indicates that the appellant was informed of his rights prior to questioning. The transcript further states that the appellant had been advised of his rights earlier that evening, that the appellant understood the English language, that the appellant understood his rights, and that the appellant wanted to "come clean" and cooperate. *See State v. Van Tran*, 864 S.W.2d 465, 471–473 (Tenn. 1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994).

The appellant also contends that he was threatened and offered a promise in exchange for his confession. With respect to the promise, the appellant argues that Investigator McDowell assured him that he would receive treatment and would be sent to a hospital rather than to a jail. The record reflects that the appellant suggested to the officers that he suffered uncontrollable urges and required psychological treatment. The record reflects that McDowell told the appellant that he would inform the court that the appellant suffered a psychological problem and needed treatment. The record does not indicate, however, that McDowell promised the appellant that he would receive treatment.

Moreover, as mentioned earlier, the transcript of a subsequent pre-trial proceeding indicates that the appellant was untruthful about the offer of any promises and the use of force by the officers. Indeed, our examination of the totality of the circumstances surrounding the appellant's interviews with the police reveals that the appellant's waiver of his rights was not the product of intimidation, coercion, or deception, but was the appellant's free and deliberate choice. As stated above, the trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the appellant can show that the evidence preponderates against the trial court's ruling. *O'Guinn*, 709 S.W.2d at 566; *Stephenson*, 878 S.W.2d at 544. The appellant has failed to carry his burden. We conclude that the trial court's denial of the motion to suppress was proper.

### E. Jury Selection

The appellant next contends that the court, the prosecution, and defense counsel erred in numerous ways in selecting the jury. Specifically, the appellant presents the following arguments: the court inappropriately denied the appellant's motion for change of venue; the court failed to adequately question prospective jurors concerning their exposure to pre-trial publicity; the court inappropriately rehabilitated jurors who stated they would automatically impose the death penalty and inappropriately prevented defense counsel from rehabilitating jurors who stated they could not impose the death penalty; the court prevented the jurors, in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), from fully understanding their responsibility for determining the appellant's penalty; and the jury selection process in Dyer County fails to produce a venire representing a fair cross-section of the community.[21]

---

21. Prior to submitting briefs in this case, the appellant filed a motion to remand the case to the trial court for an evidentiary hearing in order to further develop the record with respect to the following issues: whether the appellant was denied effective assistance of counsel; whether pre-trial exposure to information affected the impartiality of prospective jurors; and whether the jury selection process in Dyer County results in a

## I. Pre-trial Publicity

The appellant argues that the majority of prospective jurors were exposed to pre-trial publicity. In this regard, the appellant asserts that the court and the parties failed to conduct adequate voir dire of individual jurors. Moreover, the appellant argues that the trial court should have changed the venue of the case.

Specifically, the appellant claims that, during voir dire, forty of the fifty-six prospective jurors stated that they had previously either read or heard information about the case. According to the appellant, thirty-three of those forty jurors were not questioned concerning the nature and extent of their exposure to pre-trial publicity. Moreover, eleven of the twelve jurors who served on the jury were exposed to pre-trial publicity. Nine of these jurors were not asked about the nature and extent of their exposure.

The State contends that the jurors were properly questioned concerning their exposure to publicity, and the trial court appropriately determined that a fair trial could be held in Dyer County. As the State notes in its brief, eleven jurors were dismissed due to exposure to pre-trial publicity or a predisposition to impose the death penalty. The majority of the remaining prospective jurors indicated that they had read or heard something about the case but were unable to remember much of that information and had not formed an opinion concerning the appellant's guilt or innocence. At least nine prospective jurors stated that they could not remember any information about the case or had not been exposed to any pre-trial publicity.

Rule 24 of the Tennessee Rules of Criminal Procedure provides: "If the trial judge, after examination of any juror, is of the opinion that grounds for challenge for cause are present, he shall excuse that juror from the trial of the case." The rule continues:

A prospective juror's exposure to potentially prejudicial information makes him unacceptable as a juror. Both the degree of exposure and the prospective juror's testimony as to his state of mind shall be considered in determining acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and if he remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall depend on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial.

Implicit in Rule 24 is the recognition that jurors do not live in a vacuum. Because certain cases are by their very nature apt to generate publicity, it is not inconceivable that some jurors will have formed an impression or opinion concerning the case. In addressing this problem, the United States Supreme Court has observed:

It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

*Irvin v. Dowd*, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642–1643, 6 L.Ed.2d 751 (1961). *See also Brown*, 836 S.W.2d at 549. Accordingly, jurors may sit on a case, even if they have formed an opinion on the merits of the case, if they are able to set that opinion aside and render a verdict based upon the evidence presented in court. *Id.*

significant under-representation of a cognizable group. A panel of this Court denied that motion.

Accordingly, in interpreting Rule 24, this court has held that prospective jurors who have been exposed to information which will be developed at trial are acceptable, if the court believes their claims of impartiality. *State v. Shepherd,* 862 S.W.2d 557, 569 (Tenn.Crim.App.1992), *perm. to appeal denied,* (Tenn.1993). With respect to jurors who have been exposed to information which is inadmissible at trial because of its prejudicial effect, Rule 24 "implicitly places the burden upon the trial court to assess the level of prejudice apart from the juror[s'] statements." *Id.*[22] In either case, the determination of impartiality remains a matter within the trial court's discretion. *Brown,* 836 S.W.2d at 549. *See also State v. Sammons,* 656 S.W.2d 862, 869 (Tenn.Crim.App.1982). In other words, "[a] trial court's findings of juror impartiality may be overturned only for 'manifest error.'" *Cazes,* 875 S.W.2d at 262 (*quoting Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984)).

Upon motion of the appellant, the trial court permitted individual voir dire of prospective jurors regarding their pre-trial exposure to publicity and their general attitude toward the imposition of the death penalty. *See* Tenn.R.Crim.P. 24(a); *Cazes,* 875 S.W.2d at 263 (when a crime is highly publicized, the better procedure is to grant the defendant individual voir dire; individual voir dire is mandated only if there is a significant possibility of exposure to potentially prejudicial material). *Cf. State v. Claybrook,* 736 S.W.2d 95, 98–101 (Tenn.1987). As the appellant suggests, upon examination, a majority of the prospective jurors revealed that they had either read or heard something about this case prior to the trial. Again, the appellant claims that thirty-three of the forty jurors who had previously been exposed to information about the case were not questioned about the extent of that information.

Initially, we note that, although questions concerning the content of any publicity to which jurors have been exposed may be helpful in assessing impartiality, such questions are not constitutionally mandated, and the trial court's failure to delve into the jurors' exposure is not reversible error, unless the appellant's trial was rendered fundamentally unfair. *Cazes,* 875 S.W.2d at 262. In any case, contrary to the appellant's claim, those jurors with knowledge of the case were indeed asked the source and extent of that knowledge. The majority stated that they had either read about the case in the State Gazette or had heard friends talk about the case. The trial court excused nine of those jurors because of their extensive exposure to the facts of the case or personal relationships with the victim or members of her family. All of the remaining jurors who had experienced some exposure indicated that either they did not remember any of the facts about the case or had not formed any opinion concerning the case. These remaining jurors asserted that they could follow the law and the court's instructions thereon.

Rule 21 of the Rules of Criminal Procedure provides for change of venue "if it appears to the court that, due to the undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." The mere fact that jurors have been exposed to pre-trial publicity will not warrant a change of venue. *Sammons,* 656 S.W.2d at 869. Moreover, "[b]efore an accused is entitled to a reversal of his conviction on the ground that the trial judge erroneously denied his motion for a change of venue, he must demonstrate ... that the jurors who actually sat were 'biased and/or prejudiced.'" *State v. Harris,* No. 85, 1990 WL 171507 (Tenn.Crim.App. at Knoxville, November 8, 1990), *perm. to appeal denied,* (Tenn.1991) (quoting *State v. Burton,* 751 S.W.2d 440, 451 (Tenn.Crim.App.1988)). The decision of whether the venue should be changed is within the sound discretion of the trial court, and his decision will be reversed only upon a showing of an affirmative and clear abuse of discretion. *See State v. Howell,* 868 S.W.2d 238, 249 (Tenn.1993), *cert. denied,* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994); *Rippy v. State,* 550 S.W.2d 636, 638 (Tenn.1977).

---

**22.** We note that the appellant did not offer into evidence any newspaper article or television report which contained information that would have been inadmissible at trial.

After thoroughly reviewing the record, we conclude that the court did not abuse its discretion. The trial court carefully and meticulously orchestrated the jury selection process to ensure the selection of an impartial jury. *See Cazes,* 875 S.W.2d at 262 (the ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial). Accordingly, although a majority of jurors were exposed to pre-trial publicity, we conclude that the appellant's trial was not rendered fundamentally unfair as a result. *See generally State v. Melson,* 638 S.W.2d 342, 359–62 (Tenn.1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).

### ii. Juror Rehabilitation

The appellant next contends that the trial court improperly rehabilitated six jurors after they indicated a propensity to impose a sentence of death without reserving judgment until the presentation of mitigation proof. He further claims that the court improperly denied defense counsel the opportunity to rehabilitate one juror who harbored scruples about the death penalty.

Initially, we note that, at the conclusion of voir dire, the court informed the appellant that he had not exercised one of his peremptory challenges. As the State contends, in order to assign as error the trial court's ruling on challenges for cause, an appellant must exercise all of his peremptory challenges. *Middlebrooks,* 840 S.W.2d at 329. Moreover, "the failure to exclude a juror for cause is grounds for reversal only if the [appellant] exhaust[ed] all of his peremptory challenges and an incompetent juror is forced upon him." *Id.* (emphasis added). *See also State v. Kilburn,* 782 S.W.2d 199, 202 (Tenn. Crim.App.1989)("[o]nly when a defendant exhausts all his peremptory challenges and is forced to later accept an incompetent juror … can he complain about the jury composition"). Of the six prospective jurors about whom the appellant complains, none actually served as a juror on the case. Accordingly, "any error in not excusing these potential jurors is harmless because they were not forced upon [the appellant] at the trial."

*State v. Thompson,* 768 S.W.2d 239, 246 (Tenn.1989), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990). *See also State v. Simon,* 635 S.W.2d 498, 510–11 (Tenn.), *cert. denied,* 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982). The appellant's claim is without merit.

Additionally, the appellant's contention, that he was improperly prevented from rehabilitating one juror who indicated that she was opposed to the death penalty, is meritless. When asked by the prosecutor if she could impose the death penalty, Juror Carson indicated that she probably could not. The Court then asked Carson on two separate occasions if she could consider the death penalty as a possible punishment. Each time, Carson indicated that, regardless of the evidence, she would feel uncomfortable considering the imposition of the death penalty. Finally, the court inquired, "Now, let me make sure I understand. Are you saying that you would automatically vote against the death penalty in any case regardless of what the evidence might show? Is that correct?" Carson replied affirmatively.

We agree with the State that Ms. Carson's final response left "no leeway for rehabilitation." *Strouth,* 620 S.W.2d at 471. *State v. Alley,* 776 S.W.2d 506, 517–518 (Tenn.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 775 (1990). In any event, assuming that the questioning of Ms. Carson by the prosecutor and the court "had not reached the point that left no leeway for rehabilitation," we must consider whether the dismissal of Ms. Carson for cause was appropriate under the dictates of *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). *See Alley,* 776 S.W.2d at 517–518. In *Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852, the United Stated Supreme Court delineated the following standard for determining whether a juror was properly excused for cause: "whether the juror's views would 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath.'" The Supreme Court further observed that "this standard does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id.* Finally, the Court noted

that "deference must be paid to the trial judge who sees and hears the jurors." *Id.* at 426, 105 S.Ct. at 853.

We conclude that Ms. Carson's responses to questioning by the prosecutor and the court adequately demonstrated that her views concerning the death penalty "would [have] 'prevent[ed] or substantially impair[ed] the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" *Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852. *See also, State v. Smith,* 893 S.W.2d 908, 915–16 (Tenn.1994), *cert. denied,* 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995). Moreover, as noted earlier, great deference should be given to the trial judge, who is "left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright,* 469 U.S. at 426, 105 S.Ct. at 853. The trial court's findings "shall be accorded a presumption of correctness and the burden shall rest upon the appellant to establish by convincing evidence that [those findings were] erroneous." *Alley,* 776 S.W.2d at 518. The appellant has failed to meet this burden.

### iii. *Caldwell* Violations

The appellant next argues that the trial court committed errors in violation of the Supreme Court's decision in *Caldwell,* 472 U.S. at 320, 105 S.Ct. at 2633. Specifically, the appellant contends that the trial court improperly sustained the prosecutor's objection when defense counsel referred during voir dire to "voting to kill the defendant," "how [the jurors] feel about killing the defendant," and "frying" the defendant. According to the appellant, the court's ruling shielded the jury from the harsh reality that it would sit in judgment of the appellant's life.

The appellant's argument is without merit. In *Caldwell,* the United States Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a deter-

mination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 2639. In the subsequent case of *Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994), the Court noted that it has

> since read *Caldwell* as "relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright,* 477 U.S. 168, 184 n. 15, 106 S.Ct. 2464, 2473 n. 15, 91 L.Ed.2d 144 (1986). Thus, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989).

The record is devoid of any indication that either the court or prosecutor misled the jurors as to their role in the sentencing process. The prospective jurors were asked whether or not they personally could impose the death penalty if the State proved that the aggravating circumstances existed beyond a reasonable doubt and that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. See Tenn.Code Ann. § 39–13–204(g)(1). These questions properly outlined the sentencing jury's duty in a capital case. The appellant offers no authority, and we cannot find any, which requires the court to allow the appellant to employ colorful semantics, such as "kill" and "fry," to convey to the prospective jurors their duty under the law.

### iv. Juror Pool

Finally, the appellant contends that the jury selection process in Dyer County did not afford the appellant a jury representative of a fair cross-section of the community.[23] Specifically, the appellant claims that the use of a list of registered drivers as the pool from

---

**23.** The appellant also appears to raise a Fourteenth Amendment equal protection challenge to the selection of the venire. However, the appellant has failed to present any proof of purposeful discrimination in the selection process. *See Ev-*

*ans,* 838 S.W.2d at 193 (citing *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977)). *See also Batson v. Kentucky,* 476 U.S. 79, 93–97, 106 S.Ct. 1712, 1721–1722, 90 L.Ed.2d 69 (1986).

which to draw prospective jurors essentially denies African–Americans the opportunity to serve on a jury. The appellant neither offers legal authority nor cites to any proof in the record which would support his argument.

The United States Supreme Court set forth a three-pronged test in *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), for determining whether a jury was properly selected from a fair cross-section of the community pursuant to the Fifth and Fourteenth Amendments. Accordingly, in order to establish a prima facie violation of the fair cross-section requirement, the defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community;[24]

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;

(3) that this under representation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 363, 99 S.Ct. at 668. The Tennessee Supreme Court has adopted this test. *State v. Buck*, 670 S.W.2d 600, 610 (Tenn.1984). *See also Adkins v. State*, 911 S.W.2d 334, 353 (Tenn.Crim.App.), *perm. to appeal dismissed*, (Tenn.1995); *State v. Blunt*, 708 S.W.2d 415, 417 (Tenn.Crim.App. 1985), *perm. to appeal denied*, (Tenn.1993).

T.J. Jones, the Circuit Court Clerk for Dyer County, outlined to the trial court the method by which his office selects the jury venire in Dyer County. He testified that his office selects the jury venire from a list of licensed drivers in the county. Out of the total county population of 38,000 people, there are 28,000 licensed drivers. Members of Jones' office calculate the number of jurors required for a two year period, which in this case was approximately 3,000. They then divide the number of licensed drivers by the number of jurors needed. The quotient determines the number of names they will skip when they count down the alphabetical list of 28,000 licensed drivers to obtain 3,000 jurors. Mr. Jones further testified that, of the 150 jurors available for the selection of the appellant's jury, twelve or thirteen were African–Americans. Consequently, African–Americans constituted approximately eight percent of the prospective jurors. Finally, Jones testified that approximately seven percent of the population of Dyer County is African–American.

Accordingly, the record reveals no disparity between the size of the cognizable group in the community and its representation in the appellant's jury venire. Nor does the record contain evidence that the use of driver's license rolls has resulted in the systematic exclusion of African–Americans in the jury selection process. Indeed, our supreme court has approved the use of voter registration lists to select potential jurors. *See State v. Caruthers*, 676 S.W.2d 935, 939 (Tenn. 1984), *cert. denied*, 469 U.S. 1197, 105 S.Ct. 981, 83 L.Ed.2d 982 (1985). Although no court in this state has addressed the use of driver's license rolls in selecting jury venires, we can see no material difference between the use of a list of registered voters and the use of a list of registered drivers.[25] The

24. We recognize that the appellant automatically satisfies the first prong as the United States Supreme Court has recognized African–Americans to be a distinctive group in the community. *See Alexander v. Louisiana*, 405 U.S. 625, 628, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972).

25. We note that the statistics provided by the Dyer County Circuit Court Clerk reveal that licensed drivers in Dyer County constitute 73.68 percent of the entire population of the county. Thus, it is readily apparent that the list of licensed drivers "provide[s] a large and easily accessible source of names, to which all potential jurors have equal access and which disqualifies jurors solely on the basis of objective criteria." *Id.See also United States v. Rogers*, 73 F.3d 774, 777 n. 2 (8th Cir.1996)(the author of the opinion

noted that several federal districts supplement their jury lists with persons who have a driver's license to increase minority representation); *Inabinett v. State*, 668 So.2d 170, 173 (Ala.Cr.App.1995)(selecting jurors from a list of licensed drivers does not violate the fair cross-section requirement of the Sixth Amendment); *State v. Paz*, 118 Idaho 542, 798 P.2d 1, 9 (1990), *cert. denied* 501 U.S. 1259, 111 S.Ct. 2911, 115 L.Ed.2d 1074 (1991), *overruled on other grounds by State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991)(voter registration lists and driver's license lists are appropriate sources from which to select jurors); *State v. Marshall*, 531 N.W.2d 284, 287 (N.D.1995)(unsubstantiated assertion that the use of jury source lists other than voters and driver's license lists, like phone books, would have been

appellant has failed to establish a prima facie case under either the state or federal constitution. Having completely reviewed the record, we do not find any error in the selection of the jury in this case. This issue is without merit.

### F. Instructions Concerning Mitigating Evidence

The appellant claims that the use of "extreme" and "substantial" as modifiers in describing the mitigating circumstances set forth in Tenn.Code Ann. §§ 39–13–204(j)(2), (8) (1991) created a reasonable likelihood that the jury understood them to prohibit consideration of the appellant's mental disturbance unless it exceeded some undefined threshold. Accordingly, the appellant asserts, the jury was prevented from considering as mitigation "any aspect of [the appellant's] character or record." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). Our supreme court has repeatedly rejected this argument. *See Smith*, 893 S.W.2d at 920; *Cazes*, 875 S.W.2d at 268; *State v. Smith*, 857 S.W.2d 1, 16–17 (Tenn.), *cert. denied*, 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993), *and cert. denied*, 510 U.S. 1040, 114 S.Ct. 682, 126 L.Ed.2d 650 (1994). Therefore, this issue is without merit.

### G. The Appellant's Right to Life

The appellant claims that the imposition of the death penalty in this case violates substantive due process and equal protection principles. The appellant contends that the State has no compelling interest in executing the appellant because it offered the appellant a life sentence in exchange for a guilty plea.[26] The Tennessee Supreme Court has consistently found that the death penalty is constitutional and does not impermissibly infringe upon the right to life. *See, e.g., Smith*, 893 S.W.2d at 926; *Cazes*, 875 S.W.2d at 253; Smith, 857 S.W.2d at 1; *Black*, 815 S.W.2d at 166; *State v. Boyd*, 797 S.W.2d 589 (Tenn. 1990), *cert. denied*, 498 U.S. 1074, 111 S.Ct.

800, 112 L.Ed.2d 861 (1991); *State v. Teel*, 793 S.W.2d 236 (Tenn.1990); *Thompson*, 768 S.W.2d at 239. This issue is without merit.

### H. Constitutionality of Tennessee's Death Penalty Statute

The appellant acknowledges that the constitutionality of Tennessee's death penalty statute has been upheld by the Tennessee Supreme Court, but raises the following issues in order to preserve them for subsequent proceedings.

The appellant argues that (1) the death penalty statute fails to meaningfully narrow the class of eligible defendants; (2) the prosecution has unlimited discretion in seeking the death penalty; (3) the death penalty is imposed in a discriminatory manner based upon economics, race, geography, and sex; (4) there are no uniform standards for jury selection; (5) the juries tend to be prone to returning guilty verdicts; (6) the defendant is denied the opportunity to address the jury's popular misconceptions about parole eligibility, cost of incarceration, deterrence, and method of execution; (7) the jury is instructed it must unanimously agree to a life sentence, and is prevented from being told the effect of a non-unanimous verdict; (8) the courts fail to instruct the juries on the meaning and function of mitigating circumstances; (9) the jury is deprived of making the final decision about the death penalty; (10) the defendant is denied the final argument during the sentencing phase; (11) electrocution is cruel and unusual punishment; and (12) the appellate review process in death penalty cases is constitutionally inadequate.

These issues have repeatedly been rejected by the Tennessee courts. *See Smith*, 893 S.W.2d at 908; *State v. Brimmer*, 876 S.W.2d 75 (Tenn.), *cert. denied*, 513 U.S. 1020, 115 S.Ct. 585, 130 L.Ed.2d 499 (1994); *Cazes*, 875 S.W.2d at 253; *Smith*, 857 S.W.2d at 1; *Black*, 815 S.W.2d at 166; *Boyd*, 797 S.W.2d at 589; *Teel*, 793 S.W.2d at 236; *Thompson*, 768 S.W.2d at 239.

---

more representative was insufficient to establish a Sixth Amendment claim).

**26.** The issue of whether the plea offer unconstitutionally tainted the imposition of the death penalty is addressed *infra* part 2(H).

## 3. CONCLUSION

After a thorough review of the issues and the record before us as mandated by Tenn. Code Ann. §§ 39–13–206(b) and (c) (1994 Supp.), and for the reasons stated herein, we affirm the appellant's conviction and sentence of death. We conclude that the sentence of death was not imposed in an arbitrary fashion, the evidence supports the jury's finding of the aggravating circumstances, and the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances. Moreover, a comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.[27]

Accordingly, the judgment of the trial court is affirmed.

/s/ David G. Hayes
David G. Hayes, Judge

CONCUR:

/s/ Jerry L. Smith
JERRY L. SMITH, Judge

/s/ Lynn W. Brown
LYNN W. BROWN, Special Judge

### ORDER ON PETITION TO REHEAR

A petition for rehearing has been filed on behalf of appellant, Glenn Bernard Mann in which he requests the opportunity to rebrief and reargue the issue that his sentence is disproportionate under this Court's recent decision in State v. Bland, 958 S.W.2d 651 (Tenn.1997). He asserts that "the failure to allow him the benefit of the new Bland procedures ... would violate the Due Process Clauses of the Fourteenth Amendment and Article I, Section 8 of the Tennessee Constitution."

We disagree. The opinion in Bland plainly states that the enumerated factors had been drawn from "a review of the comparative proportionality discussions contained in our prior decisions." Therefore, the procedures are not new.

An amicus curiae brief on comparative proportionality review has been submitted by Professor Dwight Aarons, of the University of Tennessee College of Law and Professor Michael Blankenship, of East Tennessee State University. We note that the brief was due before the decisions in Bland and Mann were released, but it was not filed until after their release. The amicus curiae submits that the pool of similar cases should include all first degree murder cases. In addition, they argue that some of the factors enumerated in the Bland decision do not aid the analysis, and others are irrelevant to the proportionality question. A majority of this Court agreed upon the analysis set forth in Bland. Though the Court did not have the benefit of the amicus curiae brief, the decision in Bland addressed the issues raised therein. The members of the Court continue to adhere to their respective opinions in Bland.

Accordingly, a majority of this Court had determined that the petition to rehear should be denied. Justice Reid would grant the petition to rehear and utilize some of the material in the amicus curiae brief to refine the procedures announced in Bland.

For the foregoing reasons, the petition to rehear is denied.

ANDERSON, C.J., and BIRCH and HOLDER, JJ., concur.

REID, J., dissents from the denial of the petition to rehear.

---

27. No execution date is set in this opinion. Tenn.Code Ann. § 39–13–206(a)(1) provides for automatic review by the Tennessee Supreme Court upon affirmance of the death penalty. If the sentence of death is upheld by the supreme court on review, that court will set the execution date.